BEN SCHULKEY, Respondent, v. A. W. BROWN and International. Harvester Company of America, a Corporation, Appellants.

(230 N. W. 6.)

346

Opinion filed March 25, 1930.

*B. H. Bradford,* for appellants.
*Sinkler & Brekke,* for respondent.

BURKE, Ch. J. This is an appeal from an order denying a motion for judgment notwithstanding the verdict, or in the alternative for a

new trial and from the judgment entered in said action. The action is for a personal injury the result of a collision between a horse and an automobile on U. S. Highway No. 9 between Carpio and Donnybrook on the 26th day of November 1928, at about ten thirty A. M.

The plaintiff on horseback started for his home from a field on the northeasterly side of the Soo Railroad track. The horse which he was riding had been trained so that he could be guided by pressure of the knees on his side and pressure of the rein on his neck. On this occasion, the plaintiff had on the horse a saddle and a halter but no bridle and he guided the horse as usual by knee pressure and pressure of the halter strap or rope on the neck. He testified as follows, "When I came across the railroad track my horse was galloping, he had got scared on the north side of the railroad. I got control of him, but when I got on the public highway he started off again. I saw the car coming when I got on the highway I should judge it was about thirty-five rods away, and as it continued to come towards me the horse was getting the best of me. I held up my hand as a signal for the automobile to stop, my left hand. He was about three or four rods behind. The horse started to turn a little bit into the road and he hit me about the middle of the road. My horse was going fast at the time. I didn't hear him blow the horn. I got a little control of the horse on the start and kept him on the right side of the road, but he got to going faster I figured he was afraid of the car. I did not know the man was trying to pass me. At the time I was struck my horse started to turn into that road that goes to my house." In cross-examination he testified, "I had my both hands on the halter. I was pulling back on him all the time. I had the halter rope on the left side pulling on it with both hands. I saw two cars coming one behind the other when I crossed the railroad track. I went about thirty-five rods on the highway before I was hit. From about half way my horse started swinging in and then I had the middle of the road I kept him as far over as I could. I used to guide him all the time that way, but that time he got scared, he wouldn't go to the right hand side. I had no way of controlling him, unless he was willing to be controlled, but he always went that way. I knew the car was coming behind me fast. There are two trails that lead off the main highway to my place, they are not dim trails they graded that up this summer a little bit. It was graded before. When I got the road I did not

try to turn I tried to keep him on the highway, because I did not want to get hit. I knew the car was coming and that if I turned there was danger of being hit. My horse was out of control I could not manage him. When the horse came to the home road he wanted to turn and I was trying to hold him all I could so he wouldn't."

The defendant Brown testified, "When I first saw Schulkey that morning he was on the other side of the railroad track, he crossed the track and went on to the highway in front of me. At the time I turned out to go by him he was about fifty feet ahead of me. I blew my horn when I turned out the first time. I blew two blasts before I started to go by him. He turned a little to the outside of the road, he did not turn around he had the reins in his left hand I did not know that he only had a halter on the horse. He was holding the lines in his left hand and slapping the horse with his right. I blew my horn two short blasts just before I went by him. He was about fifteen or twenty feet ahead of me at the time. Just as I blew my short blasts I noticed the horse turn to cross the road. He was about fifteen to twenty feet ahead of me at the time. I figured that I could get by him until he turned. He turned just as I blew those two sort blasts. I could not have avoided the injury by applying the brakes. Possibly I might have been a little nervous at the time, ordinarily I could have stopped the car inside of one hundred feet." On cross-examination, "He was on the left hand side of the road when struck. The horse was running probably twenty-five miles an hour. He turned to cross the road at the place where the road runs to his house. I did not apply the brakes. Yes, I had good brakes, wheel brakes. There is an emergency brake and a drum and foot brakes. I didn't use any of them, I didn't use the brakes I thought I was going to get by. I was going thirty miles an hour. I saw the first road but I didn't see the one where he started to turn in. They were about one hundred and fifty feet apart. I slacked up for the first road. I thought maybe he might turn up there. I was about fifty feet away from the horse when I slacked up. I don't think the horse slacked up any. He appeared to be running as fast as he could, and running all the time. The accident happened in just about the middle of the second road." This is the testimony of what happened after plaintiff got on the highway. It appears that the plaintiff was doing everything that he could possibly do to control his horse which

had become unmanageable. The defendant Brown saw the plaintiff ahead of him and while he says, he didn't know that the plaintiff did not have a bridle on the horse he saw him pulling the halter rope with his left hand and striking the horse on the neck with his right hand, and couldn't help but know that the plaintiff was trying to keep the horse over on the right side of the road and out of the way of the automobile. He could see that the horse was running, he says, "apparently as fast as it could run" and in his judgment, "twenty-five miles an hour." When he was fifty feet away he blew two blasts of his horn, when he was fifteen feet away he blew two more blasts, and just as he blew the two last blasts and was fifteen feet away the horse started to cross the road, on the road leading up to the plaintiff's home. Defendant had good brakes on his car but did not use them at any time.

"The owner of an automobile has the same right on a highway as those riding on horseback, but must operate the machine with due regard for the rights of others; and the speed of the machine, its size, appearance, manner of movement, the danger of operating it upon the highway, and the other surrounding circumstances will be taken into consideration in determining the care required of such owner. If he needlessly or recklessly runs his machine into the horse of a rider and thereby injures the horse or the rider he is liable for the injury. When overtaking a person on horseback who apparently does not hear the approach of the car, the operator cannot proceed regardless of the fact that the rider does not turn out but the speed of the machine should be slackened. If reasonably necessary, the automobile should be brought to a stop." Huddy, Auto. 601. White v. Rukes, 56 Okl. 470, 155 I ac. 1184; Furtado v. Bird, 26 Cal. App. 152, 146 Pac. 58; Hanson v. Hulet, 43 N. D. 420, 175 N. W. 205.

"Persons riding on horseback on the highway must use ordinary care to guard against dangers from automobiles. The question of whether they are so or not being usually for the jury." 4 Blashfield, Cyc. Auto. Law, 1929, p. 993; Fullenwider v. Brawner, 224 Ky. 274, 6 S. W. (2d) 264.

The negligence of the defendant, and the contributory negligence of the plaintiff, are clearly questions for the jury under the facts, and were submitted to the jury under proper instructions and the verdict is conclusive.

Appellant assigns as error the following instructions on page 29 of appellant's brief:

"I charge you further that whenever an automobile driver knows, or, in the exercise of ordinary care should know, that his machine by its movement or noise is frightening a horse which he is approaching so as to render such animal unmanageable, he must use all the care and caution such as slackening speed which a careful and prudent driver would exercise under the circumstances, and to prevent such animal from getting beyond control and avoid injury."

Appellant contends that this instruction is prejudicial as it assumed that there were facts tending to prove that the defendant Brown knew or had any reason to believe that the horse was scared.

The defendant saw the horse was running, he says, "apparently as fast as it could," he saw the plaintiff pulling on the halter with one hand and striking the horse with the other trying to guide him, and he must have known, or by the exercise of ordinary care should have known, that it was dangerous to try to pass the horse under the condition plainly visible. There is no error in the instruction.

Appellant also assigns as error the following instruction: "I charge you further that if you find from a fair preponderance of the evidence in this case that the plaintiff did signal the driver of the said automobile to stop his said automobile, and that said signal was given by plaintiff holding up his hand, and you further find that at the same time the said horse upon which the said plaintiff was riding appeared to the driver to be unmanageable and appeared to be running away, then it was the duty of the defendant to use care and caution to prevent a collision between the said automobile and the said horse."

In this instruction the court simply told the jury that if it found that a signal to stop was given, and the driver of the automobile saw the signal, and it appeared to the driver of the automobile that the horse was unmanageable and appeared to be running away then it was the duty of the defendant to use due care and caution to prevent a collision between the auto and the horse. There is no error in this instruction as it would be the duty of the defendant to use due care and caution to prevent a collision between the auto and the horse even if no signal had been given, and it did not appear to the driver of the automobile that the horse was running away.

Appellant contends, that the verdict is so excessive that it clearly shows passion and prejudice on the part of the jury. The verdict was for $4183.00.

The doctor who treated the plaintiff testified that, "He had several bruises and abrasions on his head, arm, leg and chest, that he was suffering from shock, that three ribs were broken and he took an X-ray picture of the ankle on the second day of February which was only a short time before the trial, and found the ankle still very much swollen and painful and the X-ray pictures showed a fracture. There is a piece of the bone apparently sticking out through the side, a piece chipped off. There was quite a marked swelling, the circumference of the ankle probably would be increased three quarters of an inch which would cause considerable pain. The condition of the ribs would also cause pain; that the plaintiff could not raise his left arm would be due to the fact that he hasn't recovered the use of his arm from the fractured ribs, that muscles that are attached to the rib and shoulder blade have become stiffened so he hasn't got the power to raise his arm over his shoulder; that he had one cut on his forehead and another one on the back of his head. They were small and did not need sewing, but were cut to the bone. I suppose they could have caused the dizziness he complained of, it was possible. On account of his age I would say that it would take him a greater while to recover than if he were younger. It is possible that he might never recover altogether the use of his shoulder."

In the light of this evidence we cannot say that the verdict of the jury was influenced by passion or prejudice or that it is excessive.

The judgment is affirmed.

BIRDZELL, CHRISTIANSON, NUESSLE and BURR, JJ., concur.