Louie CHAILLAND, Respondent,

v.

Franklin Elwood SMILEY, Appellant.

No. 48487.

Supreme Court of Missouri,
En Banc.

Jan. 14, 1963.

622

Ford & Ford, Wendell W. Crow, James F. Ford, Kennett, James W. Steinsiek, Oscar Fendler, Blytheville, Ark., for appellant.

Dalton & Treasure, John Hall Dalton, Harold B. Treasure, James C. Bullard, Kennett, for respondent.

HOLLINGSWORTH, Judge.

Plaintiff sued for damages for personal injuries and property loss sustained when a tractor-trailer truck owned and operated southward by defendant on Highway "Y" in Dunklin County came into collision with a horse owned and ridden southward on said highway by plaintiff, causing death of the horse and physical injuries to plaintiff. The case, originally filed in the Circuit Court of Dunklin County, went on change of venue to and was tried in Stoddard County, resulting in a verdict and judgment for plaintiff for the sum of $15,000 for personal injuries sustained by him and $500 for the loss of his horse. Defendant has appealed, asserting error as follows: that plaintiff failed to make a submissible case of defendant's alleged failure to stop his truck and thereby avoid the collision; that plaintiff was contributorily negligent as a matter of law; error in plaintiff's submission instruction "P–1" and plaintiff's measure of damages instruction "P–2"; improper and inflammatory remarks by one of counsel for plaintiff during closing argument; improper and prejudicial statements on the part of the trial judge in orally instructing the jury during trial, in commenting on the evidence and in expressing his views and opinions as to the facts and the sufficiency and weight of the evidence; and improper and prejudicial admission of certain hospital records.

The appeal herein was originally heard and an opinion rendered in Division. Thereafter, the case was transferred to Court en Banc, where it was reargued and resubmitted upon the briefs filed in Division. Portions of that opinion will be adopted without use of quotation marks.

■ In determining defendant's contention that plaintiff failed to make a submissible case and his further contention that plaintiff was guilty of contributory negligence as a matter of law, we view the evidence in the light most favorable to plaintiff, give him the benefit of all favorable inferences and disregard defendant's evidence, except to the extent it may be favorable to plaintiff. Erbes v. Union Electric Co., Mo., 353 S.W.2d 659, 663 [1].

The collision occurred ⅜ths of a mile south of Caruth, in Dunklin County, about 1:00 p. m. on May 13, 1959, a clear day. Highway "Y" at the scene and for at least one-fourth mile north thereof is a straight and level north-south blacktop road, 21 feet wide with a marked center line and has a good 6-foot shoulder on each side.

Plaintiff was sixty-six years of age and had engaged in farming, carpentering, and training horses. He was considered a good horseman. The horse, a filly named Tangerine, lacked about two months of being three years old. Plaintiff bought her when she was about three months old and had been riding her eleven months, training her for five gaits. He described her as the gentlest, best dispositioned filly he ever handled. She did not buck or try to run away; neither did she have a habit of "backing up". During early training, she showed fear of bicycles and, colt-like, wanted to go home, both of which faults she easily got over. Plaintiff rode her four or five times a week, six miles each way, and had ridden her on "this blacktop" and other highways. She had given him no trouble on any of them. As plaintiff started south on "Y" on this occasion, he stopped and talked to a hitchhiker, Albert Brisher. As he talked with Brisher, a car and a gravel truck passed without incident. Plaintiff then proceeded south at about five miles per hour along the center of the west shoulder of Highway "Y".

Defendant, 38 years old, engaged in farming and trucking, was southbound in his tractor-trailer unit, with a 27,500-pound load of gravel. The tractor was 8 feet long, the trailer 16 feet long and 7½ feet wide. He stopped and picked up the hitchhiker, Albert Brisher, and saw plaintiff about a quarter of a mile ahead of him. Thereafter plaintiff was at all times within defendant's view.

About 15 seconds before the collision, plaintiff heard an "awful noise", a spitting,

popping, backfiring, missing noise, to his rear, north of him. The noise frightened the filly and she squatted, made a couple of little jumps, and turned her rear slightly toward the blacktop. Plaintiff spoke to her, tapped her on the neck, touched her with his heels, and she started lining up with the highway. About 3 seconds later, 12 seconds before the collision, the noise, "worse than ever", began again and she became unruly. Plaintiff tried to get her under control but never completely got control of her after she first became scared. She began to "work" slightly backward toward and onto the center of the blacktop. Plaintiff got a glance at the truck's cab as it passed him and, in an instant, the left rear of the horse and the west side of the trailer, about three feet from its rear end, collided. At that moment the tractor-trailer was about 18 inches west of the center line and traveling 25 to 30 miles per hour. The collision knocked the filly back in the direction of the west shoulder. She was fighting to stay on her feet. Plaintiff, feeling she was going to fall and might injure him, "brought [his] foot over" and pushed the filly from him. He sustained severe injuries when he landed about the center of the blacktop. The filly fell at the edge of the blacktop and died.

Defendant testified that after he picked up the hitchhiker, Brisher, he started his truck in low gear and increased his speed. He pulled to the east to go around plaintiff when about 150 feet north of him; his vehicle was on the east side of the blacktop about as far as it could be and remain on the blacktop as he passed plaintiff, at which time his truck was traveling about 30 miles per hour. When the tractor got even with plaintiff the horse started "showing out big" and running backward toward the truck and defendant heard it strike the right rear of the trailer. He pulled over onto the west side of the blacktop and stopped in 150 to 200 feet. The trailer brakes were new and good and the tractor brakes were ordinarily good brakes. He did, however, plead guilty in the magistrate court to the charge of having "insufficient brakes", to avoid the expense of hiring a lawyer.

Trooper Frank Sheible arrived at the scene about 1:45 p. m. He drove the tractor-trailer just far enough to test the brakes. He testified the tractor did not have any foot brakes and that "it was a noisy rig." He did not test the trailer brakes.

Additional evidence will be stated as necessary to determine certain of the assignments of error.

■ Did plaintiff make a submissible case of actionable primary negligence on defendant's failure to stop? Under the evidence favorable to plaintiff the noise from defendant's truck frightened the filly and her actions gave defendant notice of plaintiff's efforts to control, but lack of control over, her while defendant was approaching the point of impact, about 12 seconds. Plaintiff was in defendant's line of vision. Defendant never attempted to stop before the collision after having attained a speed of approximately 30 miles per hour. He pulled over to the west side of the road and stopped in 150 or 200 feet after the collision. At 30 miles per hour, a vehicle travels approximately 44 feet in a second. Plaintiff's case was clearly submissible on defendant's primary duty to stop. Priebe v. Crandall, Mo.App., 187 S.W. 605, 607 [3]; Schulkey v. Brown, 59 N.D. 345, 230 N.W. 6 [1, 2]; 60 C.J.S. Motor Vehicles § 381, p. 935; Holloway v. Barnes Grocer Co., 223 Mo.App. 1026, 15 S.W.2d 917.

■ Defendant's contention that plaintiff was contributorily negligent as a matter of law is based upon plaintiff's failure to look to his rear and to dismount from his horse. Plaintiff knew that something, but not what, was coming from the north. He at no time looked to his rear. He thought he was agile enough to have "jumped" off the filly in 15 seconds, but he made no attempt to do so. Upon hearing the second noise, 12 seconds before the impact, the

filly became completely unruly, put herself into a bow, bowed her head towards the center of the highway and worked backward onto and toward the center of the blacktop. Plaintiff was working with, pulling and reining, the filly, "hoping I'd get her under control without having no collision." He stated that when a horse bows "you can't rein them nowhere." Defendant cites the following cases: Dempsey v. Horton, 337 Mo. 379, 84 S.W.2d 621, 625–626 [12–14]; Carpenter v. Kansas City Pub. Serv. Co., Mo., 330 S.W.2d 797, 800; Curtis v. Capitol Stage Lines Co., Mo.App., 27 S.W.2d 747, 750 [1–4]; Adkins v. Boss, Mo., 290 S.W. 2d 139, 144. They do not control the situation here presented. The rider of a horse, an animate object, does not have that exclusive control over the horse's and his own movements as does the pedestrian or motorist, who, ordinarily and under the circumstances of this record favorable to plaintiff, has and should have exclusive control over himself and the movements of the machine he operates. Moreover, defendant was under a duty to exercise the highest degree of care. Plaintiff's duty was to exercise ordinary care. The duties and abilities of the parties to avoid the collision in the available seconds were not the same; defendant being in the better position and plaintiff having a right to rely to some extent upon defendant's exercising the required care to avoid injuring him and his filly. Annotation, 50 L.R.A., N.S., 566; 38 Am.Jur., Negligence, §§ 185, 188, pp. 862, 864–865; 61 C.J.S. Motor Vehicles § 466, p. 25 et seq. Defendant's contention that plaintiff should have jumped off the filly overlooks certain testimony. Plaintiff thought he was agile enough to jump off in 15 seconds. After the first noise 15 seconds before the collision, plaintiff was getting the filly under control and lining her up with the highway, when the second noise, which caused the filly to become unruly, occurred 12 seconds before the collision. The noise from defendant's motor vehicle, not an act attributable to plaintiff, frightened the filly and brought about the situation above stated. Plaintiff's evidence does not establish as a matter of law that he voluntarily and unnecessarily, that is, of his own free will, placed himself in an appreciated dangerous or perilous position. Defendant's cases [1] involved different factual situations and some of them [2] did not turn upon an issue of plaintiff's contributory negligence as a matter of law.

■ Defendant makes extended contentions of prejudicial error in the giving of plaintiff's requested instruction P–1. The portion of the instruction under attack is:

"* * * and if you further find that the defendant, Franklin Elwood Smiley, was driving and operating his 1950 Chevrolet tractor-trailer along said road in a southerly direction, and if you further find from the evidence that the defendant's vehicle collided with the plaintiff's filly causing plaintiff to be injured and plaintiff's filly to be killed, and if you further find that the defendant saw or in the exercise of the highest degree of care could have seen the plaintiff's filly was frightened and out of control, and if you further find that the defendant, Franklin Elwood Smiley, thereafter could have stopped his vehicle and could have avoided the collision with the plaintiff's filly, and if you further find the acts on the part of the defendant, Franklin Elwood Smiley, above mentioned, if you find that he did so commit them, were negligent, and if

1. Adkins v. Boss, Mo., 290 S.W.2d 139, 144; Morris v. Kansas City Light & Power Co., 302 Mo. 475, 258 S.W. 431, 432; Smith v. Ozark Water Mills Co., 215 Mo.App. 129, 238 S.W. 573, 575 [2–4]; Stein v. Battenfeld Oil & Grease Co., 327 Mo. 804, 39 S.W.2d 345, 351 [12–14].

2. Dietz v. Magill, Mo.App., 104 S.W.2d 707; Ezell v. Kansas City, Mo., 260 S.W.2d 248, 250 [4]; Knox v. Weathers, 363 Mo. 1167, 257 S.W.2d 912, 915 [7]; Kaley v. Huntley, 333 Mo. 771, 63 S.W.2d 21, 24 [12].

you further find that the acts of the defendant, Franklin Elwood Smiley, above mentioned, caused or directly contributed to cause the injuries to the plaintiff and damages for the loss of the plaintiff's filly, if any, and if you further find that the plaintiff was not guilty of contributory negligence as defined in Instruction No. D4 & D5, then your verdict shall be in favor of the plaintiff, Louie M. Chailland, and against the defendant, Franklin Elwood Smiley."

Defendant says that the "acts" (which he concedes "evidently referred to failure to stop and failure to avoid collision") were not "acts" as such, but relate to failure to take action; and that, therefore, the instruction did not make any requirement of a finding of the failure to act. Obviously, the word "acts", as used in the instruction is inaccurate and inept; it patently refers, as defendant readily admits, to defendant's failure to stop and thereby avoid the collision. Can there be any reasonable doubt that the jury likewise so understood it? We think not. But, says defendant further, the instruction, as worded, is susceptible of different interpretations and sets up different and conflicting requirements. We do not believe that a reasonably intelligent juror, after hearing the clearcut fact issue upon which decision of the case necessarily would turn, could have been misled by the instruction in this respect.

■ The next contention is that the instruction erroneously hypothesizes and "attempts to charge negligence relative to failure to stop and then gives the jury a roving commission * * * to find [defendant] negligent if he could have avoided the collision at any time, any place or in any manner * * *." We do not so read the instruction. When the phrase "could have stopped his vehicle" is joined by the conjunctive "and" with the phrase "could have avoided collision with the plaintiff's filly", the entire clause cannot reasonably be construed to hypothesize a finding of defendant's ability to avoid the collision by any

means other than that with which it was conjoined, viz: that he "could have stopped his vehicle" (truck) *and* thereby avoided the collision. A further contention is that the two phrases above set forth, when joined with the conjunctive "and", result in the submission of both a general charge and a specific charge of negligence. These contentions are without merit.

■ Defendant's next contention is that the clause "that the acts of the defendant * * * caused or directly contributed to cause the injuries to plaintiff," etc., "authorizes remote and non-causative negligence; it gives the jury a roving commission as to causation." The evidence shows that plaintiff's injuries and property loss directly resulted, at least in part, from defendant's failure to stop, irrespective, for the moment, of whether that failure was the result of negligence on his part. But the instruction also further hypothesized as a necessary element of plaintiff's case (1) a finding that defendant, in the exercise of the highest degree of care, saw or could have seen that the horse was frightened *and out of control* and (2) the further finding that plaintiff was not guilty of contributory negligence as hypothesized in defendant's instructions D4 and D5, which submitted, respectively, the issues of plaintiff's contributory negligence. It is true, of course, that the horse contributed to cause her own destruction and plaintiff's injuries by backing herself onto the highway and into the path of defendant's truck. But, inasmuch as a horse cannot be held contributorily negligent, the misconduct on the horse's part would not relieve defendant of contributing to cause the collision by negligent failure to stop his truck after he knew, or in the exercise of the highest degree of care, should have known that a closer approach of his truck would endanger plaintiff or his horse, or both of them. The instruction is not prejudicially erroneous in that respect.

■ Defendant further contends that the instruction was erroneous, misleading and in conflict with D4 and D5. D4

submits the issue of plaintiff's contributory negligence in failing to (1) get off the horse, (2) to stop it, or (3) to change the direction of its travel and thereby avoid the collision; D5 submits plaintiff's contributory negligence in riding upon the highway a horse that was not adequately trained and controllable. Plaintiff's instruction P–1 was in conflict with those instructions only in that it hypothesized plaintiff's fact theory of causation while D4 and D5 hypothesized defendant's fact theory of causation. Defendant also claims that the instruction attempts to combine primary negligence with humanitarian negligence. Those contentions are also without merit.

■ We have also considered the remaining contentions levelled by defendant against the instruction. They are that the instruction sets up different standards pertaining to the several findings required of the jury; does not properly negative a finding of plaintiff's contributory negligence; combines contributory negligence with humanitarian negligence; assumes that plaintiff was injured (as, unquestionably, he was); and does not require a finding of the whereabouts or location of plaintiff, the distances involved, the action of the horse, time elements or speed or when and where the horse was frightened or out of control. Again we say that the instruction is by no means a model; it is ineptly drawn. But the directions by it given to the jury must be considered in the light of the issues, which, as stated, were simple and clearcut. Defendant admits that when the truck was even with the horse she was seen by him to be out of control, at which time he stopped his truck within 150 to 200 feet. But plaintiff's evidence tended to show that 12 seconds before the collision defendant, driving his truck at 30 miles an hour—528 feet from the point of collision—then saw or in the exercise of the highest degree of care should have seen that the horse was out of control and veering toward his path of travel. If the jury so found, surely it could also find that defendant, with his truck brakes in good condition, as he

testified they were, could also have stopped his truck and thereby avoided the collision and that he was, therefore, guilty of negligence in failing so to do.

We are forced to the conclusion that, despite its faults, instruction P–1 sufficiently advised and enabled the jury to return a verdict based upon the issues.

Defendant next contends that plaintiff's measure of damages instruction P–2 was prejudicially erroneous. It reads:

"The Court instructs the jury that if you find the issues for the Plaintiff herein, then in determining the measure of the Plaintiff's damages, you should take into consideration the following:

"1. Such pain and suffering of body and mind, as you find from the evidence, that he has suffered in the past as a direct result of the collision, if any, and

"2. Such pain and suffering of body and mind, as you find from the evidence, that he is reasonably certain to suffer in the future as a direct result of the collision, if any, and

"3. Such permanent injuries as you find from the evidence that he has suffered as a direct result of said collision, if any, and

"4. Such loss of earnings plaintiff has suffered, if any, as a direct result of said collision, and

"5. Such loss of earnings plaintiff is reasonably certain to suffer in the future as a direct result of said collision, and

"6. Such sums, which you may find from the evidence, plaintiff has incurred for physician's fees, surgeon's fees, and hospital bills directly caused by said collision, if any, to the extent of the reasonable value thereof.

"7. Such sums as you find from the evidence represents the difference between the reasonable value of the filly

owned by the plaintiff immediately before the collision and immediately after the collision."

■ Defendant insists that there was no evidence to support elements 4 and 5 relating to loss of earnings by plaintiff. The uncontradicted evidence shows that plaintiff, aged 65, retired from active farming in 1958. In February or March of 1959, he began to do carpenter work in rebuilding the home of Mr. Welsey. He did all of the work, except the help of one man for one-half day on roof work; rebuilt a room, the rear porch and a bedroom. After he had worked 102½ hours at $1.00 per hour, he went to a doctor in Memphis for treatment of a skin cancer and was advised to quit work. On the date of the collision, May 13, 1959, and prior thereto his health had become "good, excellent". He was taken from the scene of the collision to the Dunklin County Memorial Hospital where he was under the care of Dr. Paul Miltenberger. His injuries consisted of a broken vertebra; a broken leg at the hip joint, which is held in place by a nail; and a broken ankle. He has suffered and in the future will experience much suffering and is permanently lamed. He has a permanent 50 percent loss in the forward and backward motion of his injured foot; a permanent 10 percent disability of his knee; and a permanent 10 to 15 percent limitation of flexion in his back. His medical bill was $500.-00; his hospital bill was $857.25. There was testimony in behalf of defendant that at the scene and time of the collision plaintiff admitted that the value of his horse was $500.00. Defendant makes no claim of excessiveness of the verdict; he offered no instruction limiting the amount allowable for plaintiff's past or future earnings. The jury saw plaintiff throughout the trial and heard the doctor testify as to the extent and permanency of his disabilities. The verdict does not reflect, of course, what amount of damages, if any, it awarded for past or future earnings. But, we think the jury reasonably could find from the evidence that prior to the collision plaintiff's

earning capacity was $1.00 per hour and that, by reason of the injuries sustained in the collision, he had been and in the future would be deprived of earnings to the extent of his disability resulting from the collision. We have concluded that elements 4 and 5 of the instruction were properly a matter for consideration of the jury. Young v. Kansas City Pub. Serv. Co., Mo. App., 255 S.W.2d 113, 119 [11].

■ Another complaint is that, by reciting "that if you find the issues for the plaintiff", the instruction indicated to the jury that the only "issues" involved were those hypothesized in instruction P-1 and gave the jury a roving commission to "set up the issues" and the measure of damages it should consider in arriving at the amount of its award. This contention is hypercritical. If, under the circumstances here shown, defendant desired more specific or limiting direction on the measure of damages, he should have submitted an explanatory or modifying instruction. Young v. Kansas City Pub. Serv. Co., supra, loc. cit. 119 [10].

■ Another complaint made of the instruction is that elements 4 and 5 make no reference to findings based upon evidence, as did all of the other elements enumerated. "* * *, it might have been better in each instance to have added the phrase 'from the evidence.' However considering the requirement of the first clause that the jury's finding of the fact submitted in that clause should be 'from the evidence' together with the quoted language of the other clauses, we are of the opinion the instruction could not have misled the jury to defendant's prejudice; that is, we believe a jury composed of ordinarily intelligent laymen would understand, when all of the instruction, including the first clause, was read to or by them, that the trial court was submitting all the facts hypothesized in the instruction for the jury's finding *from the evidence*." Lansford v. Southwest Lime Co., Mo., 266 S.W.2d 564, 569 [9]. The contention is denied.

Defendant's next contention is that the court erred in refusing to declare a mistrial when, in closing argument to the jury, one of counsel for plaintiff declaimed: "I want to get briefly to the injuries in this case. You have heard the testimony here of Dr. Miltenberger, we brought you Dr. Miltenberger here today and you heard his testimony on this stand. He is the only doctor, he is the only doctor you have heard. Now, I don't know whether Mr. Ford or Mr. Elbert Ford (of counsel for defendant) thinks this man isn't injured or not, but I don't know where any other doctors are, I haven't seen any, and I know you haven't, we'll just have to leave that open." The import of the statement, fairly construed, was true. The argument was proper. The situation here shown is not comparable to the argument made by counsel and condemned in Hoffman v. Illinois Terminal Railroad Co., Mo.App., 274 S.W.2d 591, 594–595. The contention is denied.

The several incidents of which defendant assigns prejudicial conduct on the part of the trial judge are:

(1) During cross examination of plaintiff with respect to statements made by him in a prior deposition, defendant's counsel read certain statements made therein relating to whether he had pulled the horse back toward the shoulder when she heard the first noise or the second noise. After some of the statements contained in the deposition were read to him by counsel for defendant and plaintiff appeared confused, the court said: "Let's get it clear whether you are talking about after he heard the first or second noise, that doesn't show here." We find no error in that statement.

(2) During cross-examination of plaintiff, counsel for defendant asked him: "Did you contact your attorneys the date of this incident?" Counsel for plaintiff objected on ground of irrelevancy. The court stated: "Objection sustained. The question is whether the man was injured and if so whether it was due to the negligence of the

defendant." The volunteered statement of the court was improper; and it did not include the issue of plaintiff's contributory negligence. However, no objection was made; and, in any event, the court thereafter gave two liberal instructions, D4 and D5, on that issue. This, we conclude, amply served to erase any prejudicial effect the remark may have had.

(3) In response to a question propounded by counsel for defendant, the keeper of Dunklin County Memorial Hospital records had testified that certain records tendered in evidence by plaintiff had been transcribed from dictation into a dictaphone by Dr. Canlas, who attended plaintiff during an absence of Dr. Miltenberger. But she further testified, "According to hospital practice original records were written out." Her testimony was to some extent, therefore, confusing. The court then inquired as to whether the records in plaintiff's case were kept as far as the hospital was concerned in the manner records were kept "on all patients", to which the witness replied, "Yes." We see nothing prejudicial in the inquiry made. The court apparently thought it needed that information in order to determine the admissibility of the record tendered. The information by the court sought was material. The contention is devoid of merit.

(4) During extended cross-examination of the keeper of the hospital records as to the method of keeping them, defendant's counsel sought to discredit them by showing that, due to illness, Dr. Miltenberger was not in actual attendance upon plaintiff for a period of about ten days. The judge then inquired of the witness whether certain X rays were taken at the direction of Dr. Miltenberger, to which inquiry the witness gave an affirmative answer. Moreover, Dr. Miltenberger, who had priorly examined plaintiff and thereafter treated the specific injuries therein shown, definitely identified them as X rays of plaintiff. We see no prejudicial conduct of the judge in making the inquiry.

(5) During direct examination of Albert Brisher, the hitchhiker who rode to the scene of the collision with defendant, counsel for defendant repeatedly undertook to get before the jury the witness' testimony as to a "conversation" he allegedly held with plaintiff prior to the collision. The court had repeatedly held the testimony incompetent. Finally, the court said: "Mr. Ford, I don't advise you to continue asking questions that are directly in conflict with the Court's ruling." Incidents such as this should be avoided when possible. But when, as here, they are provoked by counsel there is little else to be done.

(6) On direct examination of Brisher, the witness closely corroborated the testimony of defendant as to the manner in which the collision occurred. On cross-examination he patently undertook to evade admission of a prior conviction, saying "they told a lie on me", "he accused me of saying something", "it was a bum rap", "accused me of talking", "calling them bad names." When admonished by the court to state the offense of which he was convicted, he said it was *disturbance of the peace.* But, he then admitted that he had served a term of two years in the penitentiary for the offense of which he was convicted. Also, during further cross-examination as to the manner in which the collision occurred, the witness categorically denied having made a long series of answers as shown in a transcript of questions asked and answers given by him, which were taken by stenograph and transcribed by the official court reporter. Finally, he undertook to explain the discrepancy between the answers therein and the testimony given by him at the trial. In so doing he said: " * * * actually, I went back up there and recollected all of it, you know, seen into it, * * *." Shortly thereafter the court excused the jury, called counsel to the bench and said: "Now, Gentlemen, it's evident that this man has sworn here falsely, and I think deliberately so. I think we ought to find out about this conviction. I intend to find out about it, if none of the attorneys want to, I think

it's only fair to all the parties, and I think it ought to be brought out before he's remanded to the custody of the sheriff anyway. * * *" After some colloquy, one of counsel for defendant said of the witness' testimony relating to his conviction, "I know it was something else besides disturbing the peace." Following further colloquy, the jury was recalled, and the witness, upon persistent questioning by counsel for defendant admitted that he had been convicted of "sodomy" (by means, it seems, of immoral molestation of a female child). Also, upon further questioning by counsel for defendant, the witness, referring to the collision, stated: "Well, I recollected what it was all about when I went back, you know, in passing by there, you know, and looking at things and everything. Well, I didn't know nothing the day he hit him, I didn't know a thing in the world, I didn't think nothing about it at all, it wasn't me done it and I didn't think no more about it." On cross-examination, the witness, in substance, also testified that he did not really know how the collision occurred; that it was not his fault; that it was nothing to him.

The measures taken by the court were drastic, but they occurred out of the presence of the jury. The proceedings thereafter taken before the jury were orderly; and gave the jury the benefit of testimony highly material in weighing the other portions of the witness' testimony. Under the circumstances here shown, we cannot say that the action of the court was erroneous.

Defendant's final contention is that the court erred in admitting into evidence certain X rays, plaintiff's exhibits "C" through "M", for the reason that they were not properly identified. No good purpose would be served in lengthy discussion of the evidence on this point. The X rays were produced by the medical records custodian of the hospital. Dr. Miltenberger ordered them made by the technician at the hospital. The doctor was not present when they were taken; he was ill and absent for ten days. At trial he identified the above

exhibits as those taken at his direction and pointed out the injuries inflicted upon plaintiff as shown therein. Defendant objected upon the ground of hearsay. The qualification of the doctor to testify as to the injuries shown therein is not questioned. Plaintiff was treated for those injuries. There is no evidence that he was not disabled by them to the extent testified by the doctor. The fact that the doctor was absent from the hospital and that he did not see the X rays taken does not render them inadmissible. Perringer v. Lynn Food Co., Mo.App., 148 S.W.2d 601, 603, 610 [19]. See also § 490.680 RSMo 1959, V.A.M.S.; Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, 666–668, 55 A.L.R.2d 1022; Tomlin v. Alford, Mo., 351 S.W.2d 705, 712 [8].

The judgment is affirmed.

All concur except DALTON, J., not sitting.