Marjorie HEMANN, Appellant–
Respondent,

v.

CAMOLAUR, INC., Respondent–
Appellant.

Nos. WD 62079, WD 62126.

Missouri Court of Appeals,
Western District.

March 2, 2004.

Andrew H. McCue, Kansas City, MO, for Appellant–Respondent.

Keith J. Schieber, St. Joseph, MO, for Respondent–Appellant.

Before BRECKENRIDGE, P.J., and EDWIN H. SMITH and HOWARD, JJ.

VICTOR C. HOWARD, Judge.

Marjorie Hemann (Plaintiff) sued Camolaur, Inc. (Defendant), for injuries she sustained after she slipped and fell at one of Defendant's Taco Bell restaurants in St. Joseph, Missouri, on September 22, 1996.

1. Unless otherwise noted, statutory references are to RSMo 2000.

The case proceeded to a three-day jury trial in September of 2002. After a jury returned a verdict in Plaintiff's favor assessing her total damages at $300,000, the trial court entered judgment in that amount plus court costs. The court later found Plaintiff was entitled to costs in the amount of $1,010.

On appeal from the judgment, Defendant claims the trial court erred in overruling its objection to Plaintiff's closing argument concerning Defendant's failure to call its "own" medical doctor. In her cross-appeal from the judgment, Plaintiff claims the trial court erred in not awarding prejudgment interest pursuant to section 408.040.2 [1] because the amount of the judgment exceeded her settlement offer of $300,000.

As explained below, we affirm as to Defendant's appeal, but we reverse as to Plaintiff's cross-appeal and remand for entry of a judgment including prejudgment interest.

## Background

Defendant does not challenge the sufficiency of the evidence to support the verdict. Viewed in a light most favorable to the verdict, the evidence showed as follows:

On September 22, 1996, Plaintiff, her husband, her son, and her grandson traveled from their home in Woodward, Iowa, to St. Joseph, Missouri, for Plaintiff's granddaughter's birthday party. Around noon, the family stopped for lunch at a Taco Bell in St. Joseph. After placing their order at the counter, they went to find a seat in the dining area. As Plaintiff walked to the dining area while carrying a tray of drinks, she fell, landing on her back with her left knee "bent up under [her]." Immediately after the fall, she noted that

her back hurt and her knee "really hurt bad." Eventually, her husband and a bystander helped her up, and she went to a nearby booth to sit down. After they sat down, Plaintiff noticed a "wet floor" warning sign near where she fell, but it was tucked behind a booth, hidden from view. Plaintiff also noticed water dripping from a fan or vent in the ceiling to the spot where she had fallen.

Shortly after Plaintiff fell, Diane Patton, the assistant manager of the store, discussed the incident with Plaintiff and her family. Ms. Patton indicated to Plaintiff that the employees at the restaurant had been trying to keep up with the water leak all day. After having Plaintiff fill out an accident report, Ms. Patton suggested Plaintiff see a doctor at the local medical clinic. After leaving the Taco Bell, Plaintiff went to the medical center, where x-rays of her knee and back were taken. The doctor, who indicated to Plaintiff that she had sprained her knee, put a stabilizer on her knee, gave her a prescription for pain pills, and advised her to see her family doctor in Iowa in a few days.

Plaintiff and her family returned to their home in Iowa that same day. The following week, Plaintiff spent a lot of time in bed and used ice on her back. She also had pain in her head, neck, and knee. Three days after the fall, Plaintiff went to see her family doctor, Dr. Halberg. She complained of continuing pain in her knee and back. Her doctor indicated that "he was sure it would get better" and prescribed physical therapy and some prescription medications. Plaintiff went to "some" of the physical therapy appointments but not all of them because "it was uncomfortable" and thirty miles from her home. And "riding in the car really bothered [her] back a lot."

On October 17, 1996, Plaintiff returned to her family doctor's clinic, continuing to complain of pain in her lower back that was "getting worse and moved down into [her] legs." She also had problems with her feet tending to drag when she walked. The doctor again told her it would "get better" and eventually "resolve itself." However, Plaintiff never felt she was "getting better" and continued to receive physical therapy treatments, during which she eventually mentioned to her therapist that she had been having trouble controlling her bladder. After hearing this, the therapist referred Plaintiff to Dr. McKey, a neurologist in Ames, Iowa, for a CAT scan and an MRI. Dr. McKey diagnosed a herniated disc in Plaintiff's lower back. As treatment, Plaintiff received cortisone injections and two epidurals for short-term relief from her back pain. After the last epidural, Plaintiff experienced a "really sharp pain" and returned to see Dr. McKey, who referred her to Dr. Terrance Lagerlund, a neurologist at the Mayo Clinic. On December 17, 1997, Dr. Lagerlund specifically diagnosed a "L4–5 central herniated disc and a [chronic] right L5 radiculopathy," which he described as a "pinched nerve." After testing, Dr. Lagerlund determined that Plaintiff's injuries required surgery, for which she was referred to a Mayo Clinic neurosurgeon.

The surgery in January of 1998 relieved some of Plaintiff's back pain and other problems. Although she still sometimes has numbness in her right foot and some pain in her right leg, she does not have the shooting pains down her legs that she had prior to surgery. However, at the time of trial, she continued to ice her back nightly, and twice a week she was using a portable "TENS unit," which electrically stimulated her lower back to help ease the pain. Her bladder problems also improved. Although she continued to suffer from incontinence, it was not as bad as it had become prior to the surgery.

On January 16, 2002, Plaintiff filed her Petition for Damages against Defendant for negligence.[2] On February 26, 2002, Plaintiff sent, by certified mail to Defendant's counsel, an offer to settle her claim for $300,000. The offer was not accepted and discovery continued, which included Plaintiff's depositions of Drs. Lagerlund, Marsh and Ver Helst.[3]

On September 10, 2002, the case proceeded to a three-day jury trial. During the trial, Plaintiff, her son, her husband, Ms. Patton (the Taco Bell assistant manager), and Cindy DeSpain (the Taco Bell manager who was not on duty at the time of the incident but testified concerning normal protocol when accidents occur at the restaurant) all testified to the events surrounding Plaintiff's fall and her subsequent condition. In addition, Plaintiff presented medical evidence as follows: the deposition testimony of Dr. W. Richard Marsh, who directed her surgery at the Mayo Clinic, which was read to the jury; portions of videotaped deposition testimony from her chiropractor, Dr. Kurt Ver Helst, which was shown to the jury; and portions of videotaped deposition testimony from Dr. Lagerlund, which was also shown to the jury. Defendant also presented the testimony elicited from Plaintiff's doctors on cross-examination in addition to portions of deposition testimony from Plaintiff and her husband.

The case was submitted on comparative fault principles. The jury returned a verdict in Plaintiff's favor, finding Defendant one hundred percent at fault and assessing damages at $300,000. The trial court subsequently entered judgment for Plaintiff for $300,000 "plus court costs." Plaintiff then applied for taxation of deposition costs and moved to amend the judgment to include prejudgment interest. Defendant also moved for a new trial. After a brief hearing on the motions, the trial court denied Defendant's motion and Plaintiff's motion for prejudgment interest and granted Plaintiff's application for taxation of costs. It ordered that its judgment entry reflect an award to Plaintiff of total costs in the amount of $1,010.

Both parties have appealed.

## Defendant's Appeal

In its sole point on appeal, Defendant claims the trial court erred in overruling its objection to Plaintiff's closing argument concerning Defendant's failure to call its "own" medical doctor.

The primary point of contention throughout the trial was whether Plaintiff's slip and fall at Defendant's restaurant caused or contributed to cause Plaintiff's back injury; or, as argued by Defendant, whether Plaintiff's back injury was not caused by the slip and fall and was instead related solely to Plaintiff's preexisting degenerative back problems for which she had sought chiropractic and other treatment prior to the fall.

During the opening portion of Plaintiff's closing argument to the jury, Plaintiff summarized the medical testimony concerning the relationship between Plaintiff's injuries and the slip and fall and made the following argument, the italicized portions of which Defendant now complains:

[PLAINTIFF'S COUNSEL]: Those doctors that we brought to you who testified to you the evidence. And you'll

**2.** The petition also included a count brought by Plaintiff's husband for loss of services. That claim was dismissed prior to trial and is not discussed in this opinion.

**3.** It is not clear from the record exactly when these depositions were taken, but it would appear that they did not occur until after Plaintiff made her offer to settle and the Defendant *did not accept the offer.*

see when you look at the instructions, it talks about witnesses and evidence. Doesn't say anything about what the lawyers say. So you look at the witness testimony and the evidence.

Those doctors who go to school and who are board certified and put their reputation on the line when they testified at the Mayo Clinic testify to a reasonable degree of medical certainty and professional certainty.

You might ask yourselves, the defendants offered how much medical proof. None. Did some doctor come here and endorse the theory that well, she's been to a chiropractor so this fall couldn't have contributed to cause her injury? You can walk out the front door of this courthouse and point in any direction but west and you are pointing at the Heartland Health Facility.

*I would suggest to you that the defendant's inability to get a doctor to come here and endorse their views about the medical evidence speaks volumes about the weakness of their case. No doctor is going to come in here and swear—*

[DEFENSE COUNSEL]: Your Honor, I object. May we approach the bench?

THE COURT: Yes.

(Counsel approached the bench, and the following proceedings were had:)

[DEFENSE COUNSEL]: I think he is asking the jury to make an adverse inference that we didn't have a doctor testify. I don't think that is appropriate.

[PLAINTIFF'S COUNSEL]: Well, it certainly is.

THE COURT: Well, neither one of you cite any authority to it. I think it's probably been argued about enough. You have made your argument. However, there was cross-examination and you will be able to respond in your argument. I think you pretty well covered it. I'm going to overrule the objection. But please conclude and move on.

[PLAINTIFF'S COUNSEL]: I may continue the concluding remarks?

THE COURT: Yes, you may continue to conclude and move on. But I'll entertain another objection.

(The proceedings returned to open court.)

[PLAINTIFF'S COUNSEL]: *There was no doctor here to testify for them . . . .*

(Defendant's emphasis.) Plaintiff did not pursue the argument any further, no further objections were made, and Defendant requested no further relief.

Defendant complained in its motion for new trial and now complains on appeal that the trial court erred in overruling its objection to this argument because the argument "was an improper attempt to shift the burden of proof and draw an adverse inference in that Defendant did not have Plaintiff examined, did not have the burden of proof, did not designate its own medical expert and the argument was an improper reference to a phantom witness."

■ "Counsel on both sides of the bar are permitted wide latitude and discretion in referring to evidence and arguing inferences during closing argument." *Nelson v. Waxman,* 9 S.W.3d 601, 606 (Mo. banc 2000). Thus, we review the trial court's decision to overrule Defendant's objection to this portion of Plaintiff's closing argument for abuse of discretion; that is, we must determine whether Plaintiff's counsel's comments, when interpreted in light of the entire record, were plainly unwarranted and clearly injurious to Defendant. *Coats v. Hickman,* 11 S.W.3d 798, 802–03 (Mo.App. W.D.1999).

In support of its claim that Plaintiff's argument was an improper attempt to shift the burden of proof and have the jury draw a negative inference, Defendant likens Plaintiff's argument to the condemned argument in *Hoffman v. Illinois Terminal Railroad Co.*, 274 S.W.2d 591, 595 (Mo. App.1955). In *Hoffman*, "[p]rior to trial defendant did not request a medical examination of plaintiff by a doctor of its own choosing under Section 510.040 RSMo 1949." *Id.* at 594–95. Plaintiff argued in closing that "although defendant had the *opportunity* and the *right* to have plaintiff examined by any doctor of its choice in St. Louis or in the entire United States, it did not do so." *Id.* at 595. In finding the argument "improper and prejudicial," the *Hoffman* court's primary concern was the fact that under section 510.040, the defendant was not "entitled as a matter of right to a physical examination of plaintiff by court order," so

> [t]here was no basis for the argument that defendant had a right to the examination. Nor was there any obligation on defendant to request a physical examination of plaintiff. A defendant is entitled to decide for itself whether such an examination is necessary or expedient in order to protect its interests in preparation for trial, and if defendant determines not to request an examination it should not be subject to any unfavorable inference arising out of its failure to do so.

*Id.* The argument was further prejudicial because the plaintiff's counsel made it in "his final appearance before the jury," so the defendant had no opportunity to respond to it except by objection. *Id.*

In this case, however, Plaintiff never misstated the law by telling the jury that Defendant had a *right* to have Plaintiff examined, leading to the plain inference found in *Hoffman* "that the failure to exercise this right was a tacit admission that plaintiff's injuries were of the serious nature and character testified to by plaintiff and plaintiff's doctor." *Id.* Nor did Plaintiff's argument assert that Defendant had an obligation or duty to bring in medical evidence, thereby shifting the burden of proof. Rather, we find that Plaintiff's argument was more similar in effect to the arguments distinguished from *Hoffman* in *Chailland v. Smiley*, 363 S.W.2d 619, 629 (Mo. banc 1963),[4] and *Eaves v. Wampler*, 390 S.W.2d 922, 929 (Mo.App.1965);[5] that is, when considered in light of the entire record, the argument briefly commented on the fact that Plaintiff's medical evidence was uncontroverted, a permissible argument, and it did not amount to prejudicial error.

■ The trial court was in the best position to judge the effect of the argument in light of the overall circumstances. Unlike in *Hoffman*, Plaintiff made the offending argument during the first portion of her closing argument. As the trial court

---

**4.** In *Chailland*, 363 S.W.2d at 629, the court found no error in the trial court's admission of the plaintiff's argument: " 'I want to get briefly to the injuries in this case. You have heard the testimony here of Dr. Miltenberger, we brought you Dr. Miltenberger here today and you heard his testimony on this stand. He is the only doctor, he is the only doctor you have heard. Now, I don't know whether Mr. Ford or Mr. Elbert Ford (of counsel for defendant) thinks this man isn't injured or not, but I don't know where any other doctors are, I haven't seen any, and I know you haven't, we'll just have to leave that open.' "

**5.** In *Eaves*, 390 S.W.2d at 929, the court found no prejudicial error where the "plaintiff had offered the testimony of the treating physician and the hospital records and [the plaintiff was allowed to argue] 'nothing else has been brought in on their side'; that is, no medical testimony was offered by the defendant."

pointed out in overruling Defendant's objection to this portion of Plaintiff's argument, "there was cross-examination and [Defendant would] be able to respond in [its] argument." Indeed, in its closing argument, Defendant responded to Plaintiff's argument that her medical evidence was uncontroverted. Defendant specifically highlighted each portion of the relevant medical evidence and Plaintiff's contradictory statements brought out during cross-examination concerning Plaintiff's preexisting problems with her back, which she had not reported to the Mayo Clinic doctors. Even if Plaintiff's comments during closing argument about Defendant's *"inability* to get a doctor" and the fact that "there was no doctor [there] to testify for [Defendant]" could arguably have come close to overstepping the boundaries of proper argument when considered in isolation, we must consider the argument in light of the entire record to determine if the comments were plainly unwarranted and clearly injurious to Defendant. (Emphasis added.) In other words, we must determine if Defendant suffered prejudice that warranted a new trial. *Coats,* 11 S.W.3d at 802–03. Having so reviewed the argument, we perceive no abuse of discretion in the trial court's handling of the situation.[6]

Defendant's point on appeal is denied.

## Plaintiff's Cross–Appeal

■ In her cross-appeal, Plaintiff claims the trial court erred in not awarding prejudgment interest. The facts giving rise to this issue are as follows:

On February 26, 2002, Plaintiff sent by certified mail to Defendant's counsel an offer to settle her claim against Defendant for the sum of $300,000. The offer was not accepted or rejected by or on behalf of Defendant within sixty days.

On September 12, 2002, the jury returned a verdict in Plaintiff's favor, assessing one hundred percent fault to Defendant and finding Plaintiff's damages to be $300,000. The trial court entered judgment "for three hundred thousand dollars ($300,000), plus court costs," as required by Rule 77.01,[7] which provides, "[i]n civil actions, the party prevailing shall recover his costs against the other party, unless otherwise provided in these rules or by law." Plaintiff then filed an application for taxation of deposition costs and a motion to amend the judgment to add prejudgment interest.

On October 22, 2002, after conducting a hearing, the trial court granted Plaintiff's application for taxation of deposition costs, ordering "that the JUDGMENT ENTRY shall reflect that costs" of $1,010 "relating to litigation and depositions be awarded to Plaintiff." The court denied Plaintiff's motion to amend the judgment to include prejudgment interest.

Section 408.040.2 provides in relevant part:

> In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and *the amount of the judgment or order exceeds the demand for payment or offer of settlement,* prejudgment interest, at the rate specified in subsection 1

---

**6.** Defendant also claims that Plaintiff's argument improperly referenced a "phantom witness." The cases cited in support are inapposite as they involve improper argument about a party's failure to call a particular witness whose availability was subject to dispute or debate. Here, Plaintiff did not argue that Defendant had a witness available but failed to call him or her.

**7.** Rule references are to the Missouri Rules of Civil Procedure (2002).

of this section, shall be calculated from a date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier.

(Emphasis added.) The issue is whether the "amount of the judgment" exceeded Plaintiff's offer of settlement so as to require an award of prejudgment interest under this statute.

Plaintiff claims the trial court erred in denying prejudgment interest because the judgment of $300,000 plus $1,010 in costs exceeded her settlement offer of $300,000. In other words, she claims that the costs awarded in the trial court's judgment are included in the "amount of the judgment" under section 408.040.2. Defendant, on the other hand, insists that the trial court did not err because "Plaintiff's damages as determined by the jury did not exceed the demand." It seeks to equate "the amount of the judgment" with the amount of damages awarded by the jury in its verdict.

The particular circumstances of this case present what must be an unusual situation where the jury's verdict of $300,000 matched Plaintiff's settlement offer. The "amount of the judgment" will exceed Plaintiff's offer of settlement to require prejudgment interest only if the costs awarded in the judgment are included. We found no Missouri case directly addressing the issue of whether "the amount of the judgment," as that term is used in section 408.040.2, includes the amount of costs awarded by the trial court pursuant to Rule 77.01.

The issue requires statutory interpretation of section 408.040.2, which is a question of law, so our review is de novo with no deference to the trial court's decision on the issue. *Anderson v. Village of Jacksonville,* 103 S.W.3d 190, 195 (Mo. App. W.D.2003). We consider the statutory language by its plain and ordinary meaning in an attempt to determine the intent of the legislature from the language used and give effect to that intent, if possible. *Id.* " 'The entire statute should be construed to determine legislative intent, and all provisions should be harmonized, if reasonably possible.' " *Id.* (quoting *Campbell v. Labor & Indus. Relations Comm'n,* 907 S.W.2d 246, 249 (Mo.App. W.D.1995)).

The word "judgment" is not defined in section 408.040.2. However, our legislature has defined the term in section 511.020 as follows: "A 'judgment' is the final determination of the right of the parties in the action." In this case, the trial court's final determination is that Plaintiff has a right to receive, and Defendant is obligated to pay, $300,000 (the verdict amount) "*plus* court costs" in the amount of $1,010, for a total "judgment" of $301,010. (Emphasis added.) Thus, the "amount of the judgment" exceeds Plaintiff's $300,000 settlement offer by $1,010. For us to construe the "amount of the judgment" to mean the "amount of the damages" or the "amount of verdict" as Defendant argues would require us to disregard the plain meaning of the statute or to read additional language into section 408.040.2; the statute does not say prejudgment interest is awarded where the "amount of the judgment *exclusive of costs* exceeds the demand for payment or offer of settlement."

This decision is consistent with our supreme court's opinion in *Lester v. Sayles,* 850 S.W.2d 858, 873 (Mo. banc 1993). In *Lester,* the defendants claimed in part that section 408.040.2, RSMo Cum.Supp.1992, was unconstitutionally vague because "the amount on which prejudgment interest is to be assessed cannot be determined from the language of the statute." *Id.* The defendants' language suggested there were two possibilities: (1) "the assessment should be made either on the full amount of the final judgment"; or (2) the assessment should be made "only on the differ-

ence between the final judgment and the plaintiffs' offer of settlement." *Id.* The court read subsection 1 of section 408.040, which states that "[i]nterest shall be allowed on *all money due* upon any judgment or order of any court from the day of rendering the same until satisfaction be made by payment" (post-judgment interest), and subsection 2, which "requires that prejudgment interest be paid only 'if the claimant has made a demand for payment . . . and the amount of the judgment or order exceeds the demand for payment . . . ,'" in harmony and concluded: "[t]he statute tolerates only one interpretation: Prejudgment interest is to be calculated on the *entire amount of money due* where *this amount* exceeds the settlement offer." *Id.* (Emphasis added.) If prejudgment interest is to be calculated on the "entire amount of money due," then the entire amount of money due should be considered when comparing the settlement offer to the "amount of the judgment" for purposes of determining whether a plaintiff is entitled to prejudgment interest in the first place. Here, the entire amount of money due, $301,010 exceeds Plaintiff's settlement offer of $300,000. Thus, Plaintiff is entitled to prejudgment interest.

Accordingly, the trial court erred in denying Plaintiff's request for prejudgment interest pursuant to section 408.040.2. Point granted.

### Conclusion

We remand to the trial court in order to modify its judgment to award Plaintiff prejudgment interest consistent with this opinion. In all other respects, the judgment is affirmed.

BRECKENRIDGE, P.J., and EDWIN H. SMITH, J., concur.