IDA KESSLER, RESPONDENT, v. WEST MISSOURI POWER COMPANY, APPELLANT.[*]

Kansas City Court of Appeals. May 24, 1926.

---

*Corpus Juris-Cyc References: Electricity, 20CJ, p. 343, n. 82; p. 371, n. 23; p. 389, n. 72; p. 390, n. 75; p. 392, n. 82; Trial, 38Cyc, p. 1537, n. 45; p. 1612, n. 13; p. 1615, n. 19, 21; p. 1633, n. 12; p. 1651, n. 78 New; p. 1687, n. 90.

*James H. Wilson, C. A. Calvird, Jr.,* and *James A. Parks* for respondent.

*John A. Gilbreath* and *W. E. Owen & Son* for appellant.

BLAND, J.—This is an action for the wrongful death of plaintiff's husband. There was a verdict and judgment in favor of plaintiff in the sum of $3000 and defendant has appealed.

The facts show that deceased was accidentally killed in the City of Deepwater on March 17, 1925, by reason of having received through his body a deadly charge of electricity which had escaped from one of defendant's electric wires carrying a high voltage. Defendant owned the electric plant and distributing system in the City of Deepwater. The plant had been installed by that city about ten years prior to deceased's death and it had been purchased by defendant from the city about two and a-half years prior to the latter time. Among the wires maintained by defendant in the city were those upon a line of poles running north and south along the rear of plaintiff's lot where she and her husband lived. Prior to the time that plaintiff purchased the lot, there was an alley running north and south where the poles were erected. It was thought that this alley was upon land owned by the city but after that time a survey was made and it was found that the alley ran six or eight feet further east along the rear of plaintiff's lot, so plaintiff and her husband built their rear fence along the true line of this alley, leaving defendant's wires running north and south over the rear of plaintiff's lot. The house where plaintiff and her husband resided faced west upon this lot and upon a public street running north and south. There was a shed located at the northeast corner of the lot; the shed was about twenty feet long, north and south, about nine feet wide and eight feet high. The east end of the shed was on the line between the lot and the alley and the north side on the line between plaintiff's lot and the adjoining property to the north. The property on the north was occupied by one Herbert and his family at the time deceased was killed.

One of defendant's light poles was located near the south end of plaintiff's lot, six or eight feet west of the alley; another pole was located north of this one over on the Herbert lot. There was 130 feet distance between the two poles. Five wires of defendant ran from the pole on plaintiff's lot to the one on the other lot. Three of these wires were located on a cross-arm near the top of each pole, these wires containing deadly currents of electricity, two bearing 2300 volts and one 800 volts. The two lowest wires, which were attached directly to the post, bore 110 volts, which the evidence shows is not a deadly charge. These wires ran directly over the shed on plaintiff's lot. No objection was made by plaintiff or deceased to the presence of defendant's poles and wires on her property, and it is admitted that defendant occupied her property for its purposes under an implied license.

In June, 1924, plaintiff's husband installed a radio set in the house which was located about sixty feet southwest of the shed. For the purpose of carrying one end of the aerial wire, he erected a pole at the northwest corner of the shed. This pole consisted of a 2 x 6

scantling sixteen feet and one inch long nailed to the north side of the shed at the west end thereof; the bottom of the scantling being eight or nine inches above the ground. To the upper end of this scantling was fastened a pulley with an ordinary rope running through it. The rope was fastened to the aerial about six or eight feet from the pulley. The other end of the aerial wire ran to the house and into the same to the receiving set. The rope and pulley were for the purpose of tightening the aerial. Deceased ran an uninsulated wire along the middle of this scantling from a point in the ground to a point about one foot above the upper end of the scantling, called in the testimony a ''ground wire. The evidence as to when this ground wire was installed is conflicting but as defendant insists that its demurrer to the evidence should have been sustained, we must take the evidence in its most favorable light to plaintiff and it will hereinafter be shown that there was evidence that the ground wire was installed at the time the aerial wire was erected. There is also a conflict in the testimony as to how far the ground wire extended above the scantling, but there was evidence that it extended only a foot; one of defendant's witnesses testified to the effect that it extended as little as thirteen inches above the scantling. There was evidence that the ground wire was immediately under the most western of the high voltage wires and other testimony that it was three or four inches to the east of this wire. There was evidence that at the time of the erection of the ground wire it did not extend nearer the electric wire in question than a foot.

About the middle of December, 1924, there was a rain storm in the City of Deepwater which turned into sleet and snow, forming ice in one place to a thickness of six inches. The ice did not melt until the latter part of the following January. The snow and ice collected on all the telephone and electric wires in the city. There was evidence that this resulted in causing said wires to permanently sag to some extent at various places, including the wire over the rear of plaintiff's shed. It is claimed that there was no evidence of any permanent abnormal sagging of wires over plaintiff's shed but there is evidence raising an inference that there was. The evidence shows the wires passed over plaintiff's shed midway between the two electric light poles and that the greatest sag was at that point. The sagging of the wires over the shed caused the light wire in question to come in contact with the upper end of the ground wire, resulting in the destruction of the insulation upon the light wire, the welding of the two wires at that point and the communication of the deadly current from the light wire to the ground wire. Deceased had constructed a woven wire fence from the northwest corner of the shed, running about sixty feet westward along the division line of plaintiff's and Herbert's lots. This woven wire fence ran over the scantling and ground wire.

The deadly charge of electricity, at least in part, passed into the woven wire fence and set fire to the fence and grass. The evidence shows that a current of electricity seeks the shortest route to the ground and if the ground wire had been properly grounded, no doubt most of the current, if not all, would have passed off into the ground and not into the woven wire fence. The evidence further shows that the ground wire was run into the ground a distance of only four or five inches and that after the accident it was found to be rusted where it was in contact with the earth and that rust resists the flow of electricity.

Plaintiff and deceased were eating supper when the former saw a flash of light. She then noticed the grass on fire and called this to the attention of her husband who ran out of the house. Plaintiff did not see deceased again for a few moments, after which she, also, went out of the house and then saw him against the fence; he had been electrocuted. Herbert, facing plaintiff's husband from the other side, was hanging over the fence, dead. We learn from defendant's brief that Herbert had gone to the assistance of deceased.

The petition alleged that after the erection of the aerial pole and the placing of the ground wire upon it, defendant "negligently permitted the insulation on such wires (its light wires) to wear off and become ineffective at the places where such wires pass over the roof of such shed;" that as the result of the snow and sleet storm and the snow and sleet remaining on defendant's wires, said wires extending over said shed were caused to become "loosened and sagging;" that defendant knew" or by the exercise of due diligence could have known, that such wires extending over said shed had loosened and sagged;" that the west wire on said cross-arm sagged "some three feet and the insulation had worn off or become ineffective;" that "by the exercise of ordinary care and precaution in inspecting such wire defendant could have discovered such sagging and worn insulation," and could have remedied the condition prior to the time of deceased's electrocution.

The answer contained a general denial and plea of contributory negligence, alleging that deceased carelessly and negligently erected his ground wire at or so near to the west high tension wire on defendant's poles, "without the knowledge of defendant and without its assent, as to come in contact with defendant's high tension wire as it swayed slightly in the wind;" that the electrocution was "due solely to the carelessness and recklessness of the decedent, in so placing and erecting said ground wire of said aerial in such immediate proximity to defendant's said high power wires and lines, and in connecting said ground wire with the division wire fence."

It is insisted that defendant's instruction in the nature of a demurrer to the evidence should have been given, because there was no evidence of any "worn, frayed, raveled, rubbed, cracked, broken

condition of the insulation'' on defendant's wire. There was testimony that the insulation was in good condition and even one of plaintiff's witnesses by the name of Hertzler, who assisted deceased in erecting the aerial, testified that as far as he could see at that time the insulation was in good .condition. However, there was evidence from which the jury could say that it was not in good condition. Defendant in its brief admits that there had been no change in these wires since the plant was constructed, which was ten years prior to the death of deceased. One of defendant's officers testified that the insulation on the wires was standard insulation; that it was composed of cotton fabric wrapped around the wires, which fabric was saturated with pitch and was for the purpose of holding the pitch, the pitch being the insulating material; that the insulation would break down in time, depending upon the weather conditions, but he did not think that insulation on a wire that had been up only two years would be exhausted but that it might be in three years. He testified that he would not care to take hold of such a wire after three years ''just for the fun of it.''

''Q. And the whole object of the insulation is to do what? A. That is to prevent the current from leaking out by anything coming in contact; and, if broken, so you could take hold of it, like that (ind.), for the first three or four years after it was put on—maybe longer than that, be very little danger of you getting hurt; but if you held to it for a while, the current would finally leak through it and hurt you; but that is the object, so that sudden contact might not hurt anybody—that's the object of it.''

He further testified that the color of the insulation indicated the condition that such a wire is in and that the color on the wire in question, a portion of which was produced at the trial, looked at that time ''very good.'' The evidence shows that after the accident the ground wire and light wire were welded together, showing, of course, that the insulation was gone.

From all of the testimony it was for the jury to say whether the insulation was ineffective at the place in question, although there was no direct testimony of anyone who saw the wire that the insulation appeared to be in bad condition. An inference may be drawn from the testimony of defendant's officer that insulation exposed to the weather for ten years would be ''ineffective.'' However, we may say that there was no evidence that the insulation became ineffective after the aerial was erected as alleged in the petition.

However, it is insisted that it was defendant's duty to insulate its wires only at places ''where there is reason to apprehend that a person might come in contact with its wires and that such contact and injury would be the natural and probable result of the failure to insulate.'' But it was for the jury to say under the circumstances

whether defendant by the exercise of the highest degree of care could have reasonably anticipated that deceased or plaintiff would have erected an aerial wire and other wires in connection therewith at the place in question. Radios have only recently come into general use and we are unable to find any cases dealing with the respective duties of electrical companies and radio users in connection with the location and safe-guarding of wires used by them respectively. However, radios are now so common that an electric company cannot wholly ignore them and the equipment that is erected by radio users in connection therewith. In fact, one of defendant's officers testified that he knew that radios had come into common use in the past five years, the time stated was in reference to that of the trial, which was on September 28, 1925. He was asked—

"Q. They put them up—these wires—attached with poles from their house or out-buildings, and put them up to a considerable height in the air, don't they? A. Yes; they vary in height.

"Q. Do you make any inspections of your lines, to see if there is any dangerous condition been caused by people not knowing— having no knowledge of electricity, or anything like that, and not knowing the danger of getting close to it; do you make any inspection, to see that these things are kept away from these very dangerous wires? A. There has been cases where we tell them about the hazardous condition, yes, sir."

It will be borne in mind that the radio, aerial and ground wires were erected upon property owned by plaintiff and evidently with plaintiff's consent, and it was within the province of the jury to say whether defendant with the care mentioned, could have reasonably anticipated that a radio would be installed in plaintiff's house and in connection with the installation of the same some aerial wire or its accessories would be brought near the high voltage wires of the defendant. It was not necessary that defendant anticipate that the wires would have been erected in the very way that they were actually constructed by deceased, but, as before stated, that some wire might be brought in proximity to defendant's wires and that even that such a wire might be an uninsulated one. Of course, it could hardly be denied that it would be dangerous for such a wire to come in contact with one of defendant's high voltage wires ineffectively insulated.

It is insisted that there is no evidence that the sleet storm caused defendant's wires to sag "three feet or any material part thereof." There were a number of witnesses who testified that the sleet storm had no effect upon the wires in the City of Deepwater but there was other testimony tending to show that it had. The exact amount of permanent sagging of the wires caused by this storm is not directly shown. The evidence does show that they were caused to sag and that they did not entirely go back to their original position after the ice

melted off. As before stated, there are inferences to be drawn from the testimony that the wires over plaintiff's shed were caused to permanently sag by reason of the storm. There was evidence that these wires were gone over by defendant during the September previous to deceased's death and that those that needed it were tightened, and there is nothing suggested that could have caused an abnormal sag in the wire in question of a foot unless it was the sleet storm. There was ample testimony to show that this wire sagged to at least a foot by reason of the sleet storm and the demurrer to the evidence was properly overruled.

Defendant was under the duty to exercise the highest degree of care in insulating and inspecting its wires. [Luehrmann v. Laclede Gas Light Co., 127 Mo. App. 213; Grady v. Light, Power & Traction Co., 253 S. W. 202; Williams v. Gas & Electric Co., 274 Mo. 1; Hohimer v. City Light & Power Co., 262 S. W. 403; Johnson v. K. C. Elec. Light Co., 232 S. W. 1094; Clayton v. Enterprise Electric Co., 161 Pac. 411; Gentzkow v. Railway, 102 Pac. 614.] The jury could well say that had defendant discharged its duty it could have discovered the condition of its electric wire in question and those surrounding it. The evidence tends to show that at least one of defendant's employees went up the alley seeking a short circuit after the sleet melted and went off. There is some evidence that defendant maintained an inspection of its high voltage wires but if it inspected the condition present at plaintiff's premises, it was certainly negligently done under the circumstances. It cannot be said as a matter of law that even had defendant inspected its wire it could have relied upon the fact that the ground wire appeared to be grounded and for this reason a proper inspection would not have made any difference. In the first place there is no testimony that it discovered the situation and relied upon such an assumption; in the second place the jury could well say had an inspection been made that defendant necessarily would have found the ground wire was in contact with the woven wire fence and could likewise have concluded that defendant, finding a bare wire against, or practically in contact with, its high voltage wire that had upon it ineffective insulation, in the exercise of the highest degree of care, would not have relied upon the ground wire being properly grounded but would have investigated that matter.

However, it is insisted that the demurrer should have been sustained for the reason that deceased was guilty of contributory negligence as a matter of law. This contention is based largely upon the theory that deceased ran his ground wire to a point even higher than the high voltage wire and at least within three or four inches of the same, when he had been warned by Hertzler that the aerial should not be placed nearer than three feet of the high voltage wire of defendant. The evidence shows that Hertzler did so warn deceased but Hertzler testified that he did not know that the wires contained a deadly

charge of electricity so he could not have warned deceased of that fact. Defendant's calculation as to the distance from the end of the ground wire, at the date of its erection, to the high voltage wire, is .proper provided we ignore the rule requiring us to take the evidence in its most favorable light to plaintiff, which we cannot do. There was evidence tending to show that this high voltage wire was fastened approximately at the top of the light poles, which were twenty feet high; that the normal sagging of wires of this kind is from fourteen to eighteen inches and even up to twenty-four inches would be good construction; that the sag in the summer time is from three to six inches greater than in winter. It is evidently to provide for the change in temperature that a normal sag is left in putting up wires and apparently the normal sag mentioned by the witnesses meant that existing in the summer time as metal expands with heat.

Defendant's evidence, as we understand it, tends to show that there was only the normal sag in its wires, both before and after the radio was installed and deceased's death. Taking the evidence in its most favorable light to plaintiff, there was sagging of fourteen inches at the time the radio was installed, this being the minimum normal sag mentioned in the evidence. Hertzler testified that there was between two and three feet clearance from the top of the scantling to the light wires that ran over the shed. As before stated, there was evidence that the ground wire extended as little as a foot above the scantling. The top of the scantling was sixteen feet, nine inches above the ground, the ground wire ran a foot higher than this, making the end of that wire seventeen feet, nine inches above the ground. The light wires on the light poles were twenty feet above the ground. The normal sag was fourteen inches, which would make the wires over plaintiff's shed in a normal condition eighteen feet, ten inches above the ground. Subtracting seventeen feet, nine inches, the height of the ground wire, from the eighteen feet, ten inches leaves one foot and one inch clearance between the ground wire and the light wire in controversy, with a normal sag in the latter. This is in conformity with the evidence of Hertzler who testified that there was a clearance of between two and three feet between the end of the scantling and the light wires. He stated that he did not recollect seeing any ground wire at the time the scantling was erected. We cannot say as a matter of law that deceased was guilty of contributory negligence in erecting his ground wire a foot and one inch from the electric light wire, the latter appearing to be properly insulated.

If deceased placed his ground wire so that it did not come nearer than thirteen inches of the .high voltage wire that appeared to be properly insulated, and he did not know of the fact that the latter contained a deadly charge of electricity, he was not guilty of contributory negligence as a matter of law in failing to notify the de-

fendant of his action and requesting defendant to remove its wires from plaintiff's premises to a place of safety, while, on the other hand, had he placed his wire in dangerous proximity to the. light wire, he might have been so negligent in failing to notify the company. [Asher v. City of Independence, 177 Mo. App. 1, 6.]

It is insisted that the evidence shows that deceased placed the ground wire on the scantling only a short time before the accident which resulted in his death, and as there was no more sagging of the wires after that caused by the sleet storm, he must have placed them in a negligent proximity to defendant's wires. One of defendant's witnesses testified that about a week to three weeks before deceased's death, the latter told him that he had been having trouble with static and that later deceased said he had put up a ground wire and that the conditions complained of had inproved. Another witness gave the latter conversation as on or about March 4, 1925. There is also testimony of a number of witnesses who stated that there was no ground wire installed prior to the time that the sleet melted and went off. However, we think there is some slight testimony to the contrary. Plaintiff testified that she at no time saw a ground wire, although she looked out of her window many times every day and could see the scantling but she did testify that there was no change made in anything connected with deceased's wires and scantling from the time they were first put up in June, 1924. There was some conflict in her testimony, but this was for the jury. [Cravens v. Hunter, 87 Mo. App. 456; Bond v. Railroad, 110 Mo. App. 131; Guthrel v. Slater, 153 Mo. App. 214; Bobbitt v. United Rys. Co., 169 Mo. App. 424.]

It is insisted that deceased was negligent in not properly grounding the ground wire but this negligence was not pleaded in the answer and in any event we could not convict him of contributory negligence as a matter of law in not placing the ground wire further into the ground as there is no evidence that he was experienced in the science of electricity.

We think, however, that the court erred in the matter of giving and refusing of instructions. Plaintiff's instructions Nos. 1 and 2 were erroneous in that they did not confine the facts submitted to those pleaded in the petition. They submitted negligence on the part of defendant in maintaining ineffective insulation on its wires and allowing said wires to become loose and in a sagging condition; they permitted recovery on either or both of such grounds of negligence but did not confine the jury to the sagging of the wires caused by the sleet and snow storm as pleaded in the petition but were broad enough to permit a recovery if the sag was merely a normal one in existence before said storm. There was no evidence that the insulation became ineffective after the erection of the radio as alleged in the petition. It is well settled that an instruction cannot be broader

than the pleadings nor broader than the proof and must be within the purview of both the pleadings and the evidence. [State ex rel. v. Ellison, 270 Mo. 645.]

The court erred in giving plaintiff's instruction No. 3, which reads as follows:

"The jury are instructed that if you find and believe from the evidence that the ground wire fastened to the aerial pole described in evidence in this case, extended or went above the top of such pole any appreciable distance, and by reason of extending such distance above the top of such aerial pole was liable to come into contact with defendant's power and transmission wires; and by reason thereof was dangerous and unsafe, and defendant knew of such condition, or if such ground wire had extended above the top of such aerial pole for a sufficient length of time for defendant to have known of same by the exercise of due care and diligence in the examination and inspection of its wires, then it was the duty of defendant to have advised A. J. Kessler, or his wife, to remove such ground wire to a distance where it would not come in contact with its wires, or be likely to come in contact with its wires."

The negligence submitted in this instruction was not within the issues made by the pleadings.

Defendant complains of the refusal of its instructions and the giving of the same as amended by the court. Its instruction No. 3 was properly refused. It submitted the question as to whether defendant knew of the ground wire on the scantling but leaves out the question as to whether defendant could have discovered the same by the exercise of the highest degree of care. It also submitted whether defendant could have reasonably anticipated that the sagging of its wires would have resulted in their coming in contact with the ground wire and electrifying the latter, without mentioning the high degree of care and duty that it was under to find out about this. It also fails to define proximate cause as used in the instruction. [Mulderig v. Railroads, 116 Mo. App. 655.] We see no harm done by the giving of the instruction after it was amended by the court except that the term "proximate cause" perhaps should have been defined.

The court erred in refusing to give defendant's instruction No. 13, which reads as follows:

"You are instructed that if you shall find and believe from all of the evidence that deceased, A. J. Kessler, fastened a scantling to his shed in the rear of his lot under and a little to the west of defendant's high tension electric wire on its pole line as the same then existed, and later placed a ground wire on said scantling and extended the same above the end of said pole to a level with defendant's said electric wire and so near the same as to come in contact with said electric wire as it swayed with the winds and to become charged with said high power electric current, then such act was negligence

on the part of the deceased, and if you shall further find and believe from all of the evidence that such act of the deceased, Kessler, contributed directly to his injury and death, then plaintiff is not entitled to recover and your verdict must be for the defendant.''

The evidence shows that deceased either erected the ground wire at the time he installed his radio or after the sleet melted. The instruction submits in effect that it was erected after that time, and, if it was, there is no question but that it was either placed against the high voltage wire or within three or four inches to the side of it and we feel that deceased was guilty of contributory negligence as a matter of law if he constructed it in this manner. The instruction does not submit deceased's lack of knowledge of the danger of doing the things mentioned in the instruction but we do not think that one can claim ignorance of the danger of placing a bare wire approximately against an electric light wire, especially if he has been warned as the evidence shows that deceased was, for even though he may not have known of the voltage in the electric light wire and even though he was not not versed in the science of electricity, yet any man of ordinary intelligence knows the danger of coming in contact with an electric light wire, regardless of any warning. [26 C. J. 376.] We think it would be contributory negligence as a matter of law for deceased to have placed his ground wire within three or four inches to the side of the light wire, for, as a man of ordinary intelligence, he would know that by the normal blowing of the winds the wires would inevitably be brought in contact and that sooner or later the insulation would be destroyed to such an extent as to permit the electric current to enter the ground wire and thus be brought down upon his premises, and, in addition, deceased was warned not to place his apparatus nearer than three feet of the light wires. While we cannot say as a matter of law, in view of the testimony, that deceased was negligent in approaching within three feet of the light wire, he was warned of the danger present and he attempted to ground his wire, all of which shows that he had some information concerning electricity. If deceased was guilty of the conduct submitted in the instruction, he erected his bare wire within three or four inches to the side of the light wire without any necessity of so doing, not knowing whether the latter wire was charged with a dangerous current of electricity, thus running the risk of bringing a dangerous agency in an exposed condition from a safe place down onto his premises, and if he did this, we think that all reasonable men would concede his negligence in so doing.

The court not only refused this instruction but gave it by adding thereto the following words:

'' . . . provided you further find and believe from the evidence that the defendant did not know, or by the exercise of ordinary care could not have known of the proximity of said ground wire to

said high tension wire for a sufficient length of time prior to the injury and death of said A. J. Kessler to have warned him of such danger or to have removed its said wire from its proximity with said ground wire."

The instruction as amended in effect directed a verdict for either side, depending on what state of facts submitted therein the jury found to exist. If the jury found the affirmative of the facts following the word "provided" then they were in effect instructed to find for plaintiff even though they found the prior facts to exist, yet what was submitted in plaintiff's behalf was not pleaded in the petition. The instruction as submitted is an inconsistency. It starts out on the issue of contributory negligence and ends by submitting the preceding negligence of defendant and told the jury in effect that if defendant was negligent then plaintiff was entitled to recover, in other words, that deceased was not guilty of contributory negligence. Contributory negligence, of course, is predicated upon prior negligence on the part of defendant. There is no such thing as contributory negligence if defendant's negligence excuses it. A proviso of this kind was out of place.

The court refused defendant's instruction No. 4, which reads as follows: "The jury are instructed that if you should find and believe from the evidence that deceased; A. J. Kessler, erected an aerial scantling and later placed a ground wire thereon and extended the same above the end of said aerial scantling, so near to defendant's west high tension electric wire, as the same then existed on defendant's poles, that said aerial wire came in contact with defendant's said wire and a current of electricity passed down said ground wire and onto a woven wire division fence and that said Kessler was killed by coming in contact with said current on said fence, then the plaintiff cannot recover and your verdict will be for defendant."

This instruction should have been given in view of the refusal of defendant's instruction No. 13 for the reasons already given, but the court refused to give it as offered but submitted it to the jury after adding to it a proviso in words the same as that appended to instruction No. 13. The instruction as given, for reasons we have before stated, was erroneous.

Having refused defendant's instructions Nos. 4 and 13, the court should have given defendant's instruction No. 5, which reads as follows:

"The jury are instructed that if you shall find and believe from the evidence in the case that the deceased, A. J. Kessler, erected the aerial pole or scantling described in the evidence, and later put a ground wire thereon, and ran the same into the ground and through a division woven wire fence and on up said pole or scantling and extended said ground wire so far above the end of said aerial pole and so near the high power wires of the defendant, as they then existed, that a

contact with defendant's said wires was likely to occur as they swayed with the wind and such contact did occur and a current of electricity from defendant's wires was conducted down said ground wire and onto said woven wire fence and said Kessler was killed thereby, then the plaintiff can not recover and your verdict must be for defendant.''

Instead of giving this instruction as offered, the court amended it by adding the same provision as that attached to the other instructions mentioned. The instruction as given, of course, was improper.

We have examined defendant's other instructions and find that they were properly refused. It is admitted that plaintiff's offered instruction No. 6 was erroneous, but in view of the verdict, plaintiff insists that it was not reversibly so. No doubt it will not be given on another trial.

The judgment is reversed and the cause remanded. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.