**Earl Bland BRIDGES, by his next friend, Cecil Bridges, Plaintiff-Appellant,**

**v.**

**ARKANSAS–MISSOURI POWER COMPANY, a corporation, Defendant-Respondent.**

**No. 8568.**

Springfield Court of Appeals.

Missouri.

Dec. 8, 1966.

107

Dalton, Treasure & Bullard, Kennett, for plaintiff-appellant.

Jones & Stillman, McHaney, Billings & Welman, Kennett, for defendant-respondent.

STONE, Presiding Judge.

■ For personal injuries from electrical burns and shock sustained during the early afternoon of Friday, October 16, 1964, at Kennett, Missouri, plaintiff Earl Bland Bridges, who was sixteen years and eleven months of age at the time of accident, had judgment for $15,000 upon a unanimous jury verdict. On the after-trial motion of defendant, Arkansas-Missouri Power Company [V.A.M.R. Rule 72.02; V.A.M.S. § 510.290], the trial court set aside the judgment for plaintiff and entered judgment for defendant on the stated ground that "plaintiff was guilty of contributory negligence as a matter of law." Although defendant's alternative motion for new trial was not ruled as it should have been [State ex rel. and to Use of Hickory County v. Davis, Mo., 302 S.W.2d 892, 897–898(8–10); Dawson v. Scherff, Mo., 281 S.W.2d 825, 831 (5); Hughes v. St. Louis Nat. League Baseball Club, 359 Mo. 993, 224 S.W.2d 989, 991–992(1–3), 16 A.L.R.2d 904], that omission becomes unimportant on this appeal, where the sole issue presented by plaintiff's-appellant's brief is as to whether or not he was contributorily negligent as a matter of law and the only additional issue raised by defendant's-respondent's brief is as to whether plaintiff made a submissible case

of actionable negligence on the part of defendant.[1] We remind ourselves preliminarily that, in determining both of the aforesaid issues, we must consider the evidence in the light most favorable to plaintiff, must accord to him the benefit of all supporting inferences fairly and reasonably deducible from the evidence, and must disregard defendant's evidence except insofar as it may aid plaintiff's case. Erbes v. Union Electric Co., Mo., 353 S.W.2d 659, 663(1); Chailland v. Smiley, Mo. (banc), 363 S.W.2d 619, 623(1), 5 A.L.R.3d 288.

Plaintiff and his two companions at the time of accident, namely, his brother Jerry Don Bridges and Thomas Burnett, both then fifteen years of age, were high school students. That was plaintiff's second year in the ninth grade; and, at the time of trial on December 21, 1965, he was in his third year in the same grade. The account of plaintiff and his companions concerning their conduct on the day of accident begins with the noon hour recess, during which they ate and played a pinball machine at a bowling alley. Instead of returning to school at 1:00 P.M., the youthful trio "decided to play hooky" and began (as they put it) a course of "just walking around" and "just messing around," which took them first to a grocery store for "a soda" and thereafter along a meandering route (concerning which there were conflicts in the testimony) over city streets and then *either* through an old orchard and a nine-acre cotton patch *or* along the right of way of a north-south railroad spur track to an oak tree in the "northeast part" of the City of Kennett at the east end of the cotton patch and near the unfenced west line of the railroad right of way.

This was a large, bushy tree with numerous branches and dense foliage, which stood directly under defendant's north-south three-phase, 33,000 volt, electric transmission line carried overhead on insulators mounted on crossarms at the top of wooden poles 34'6" above the ground. The trunk of the oak tree stood within five feet of one such pole. It being impracticable to insulate lines carrying high voltages, the three overhead wires were uninsulated. In answers to interrogatories received in evidence, defendant stated that in September 1962 "trees were trimmed along the entire [transmission] line by George Woods and his crew" and the oak tree then had been trimmed "so that all limbs were three feet below or distant from any of the wires of the transmission line"; that there had been aerial patrols of this line "at monthly intervals [from] May through October of 1962 and 1963"; and that the last inspection of this line prior to the accident had been in May 1964 by J. N. Goldsmith and his line crew. However, defendant's employee Ross (called as a witness for plaintiff), for thirteen years a member of a four-man tree-trimming crew under foreman George Woods (who did not testify), had no recollection of that crew having trimmed the oak tree in September 1962 or at any time prior to plaintiff's accident; and defendant's employee Goldsmith (also called by plaintiff), foreman of a crew "that maintains and constructs power lines," did not remember any inspection of that line during 1964.

In any event, the record is clear that, at the time of plaintiff's accident, the top of the oak tree had grown into defendant's transmission line. That was developed in defendant's cross-examination of plaintiff's first witness, one Estes who had taken photographs of the oak tree on the day of accident, when the witness was asked "could you see them [the wires] in the top of the tree" and answered "yes, sir." Later in the trial, defendant's employee Ross testified that, when his crew cut down the oak tree on November 9, 1964 (twenty-four days after plaintiff's accident), he had to trim the top of the tree before he could fell it because the branches were "up between

1. These issues having been presented to us in this "cart before the horse" sequence, we deal with them, infra, in the same illogical (but, on the instant facts, more convenient) order.

the lines." When asked specifically "what limbs, if any, were touching the wires," Ross said "just in the center of the tree." Branches then were touching "the outside wires" and, although not then in contact with the center wire of the three-wire transmission line, were in position to have been blown into that wire also.

The lowest limbs of the oak tree were not less than six feet above the ground—plaintiff's companion Burnett said "between six and seven feet" and witness Estes thought "approximately eight to ten feet." But whatever the precise height of the lowest limbs may have been, plaintiff had (so he said) climbed into this tree "about twelve times" during the Spring and Summer of 1964, accompanied on five or six of those occasions by his brother Jerry Don and sometimes by three other youths all of whom were identified by name but none of whom were called as witnesses. There is no suggestion that any of those previous excursions into the tree had been other than uneventful.

On the occasion under review, plaintiff's companion Burnett, then 5′7″ to 5′8″ tall, jumped and grabbed a limb with one hand and plaintiff boosted him into the tree. The record is subject to different inferences as to whether plaintiff's brother Jerry Don, then about 5′7″ tall, climbed into the tree unassisted or was boosted into it; but we find no contradiction of plaintiff's testimony that he, then about 5′10″ tall and 125 pounds in weight, climbed into the tree without assistance. Whatever the order of their ascension into the tree may have been (as to which there were testimonial discrepancies), the youths agreed that plaintiff climbed to a point where his head was six feet from the top of it, that the Burnett youth was "about middleways" in the tree, and that plaintiff's brother Jerry Don "wasn't very high." None of the youths had any purpose in climbing the tree. As plaintiff himself aptly described their conduct, they were "just messing around, passing the time away." At the moment of tragedy, plaintiff was "setting on a branch"

(so he said) or "about half sitting down and half standing" with "his back up against a limb and his feet on one of the lower branches" (so the Burnett youth recollected) or "sort of leaning back on a limb" (so plaintiff's brother thought). Whichever description of plaintiff's position may have been the most accurate, there was no evidence that any of the youths were, at the time, doing anything other than talking. After they had been in the oak tree about three minutes, plaintiff and his companions heard a "loud humming sound * * * and that's when the electricity hit us." All of the youths were rendered unconscious. Plaintiff fell to the ground and did not regain consciousness until he "come to in the emergency room" at the Dunklin County Memorial Hospital. Plaintiff's brother Jerry Don "woke up * * * laying on the ground" with plaintiff "laying beside me." Young Burnett "woke up sort of dazed" with some unidentified man "trying to help me get out of the tree."

There being no complaint that the verdict was excessive, it will suffice to record that plaintiff sustained severe burns and injuries, including a scalp laceration requiring ten sutures, a fourth degree burn of the right shoulder which became grossly infected with a large gangrenous area about eleven inches by ten inches in size "that had the appearance of charred beefsteak," and another fourth degree burn on the right leg with another gangrenous area some eight inches by five inches in size; that, when moved to a St. Louis hospital two days after the accident and placed under the care of a plastic surgeon, plaintiff was "an acutely ill boy * * * dull and lethargic, nauseated, unable to take fluids," so that "it was necessary to give him fluids intravenously for a good many days"; and that, in the interim before his discharge from the hospital on December 11, 1964, he underwent nine operations under general anesthesia, each of which involved both debridement and skin grafting. Fortunately, the results were beyond the surgeon's expectations and the only permanent condition other than

scars and sensitivity in the grafted areas, is what the attending physician in Kennett described as "possibly a ten per cent loss of strength in the injured [right] arm."

*Was plaintiff guilty of contributory negligence as a matter of law?* Instant defendant's argument on the issue of contributory negligence emphasizes additional evidence to which we now refer. The oak tree stood 1,039 feet north of defendant's substation, which was adjacent to, and just west of, defendant's Kennett ice plant. For several years prior to the accident, plaintiff had lived the second door from the ice plant and, in going to and from school, had passed both the ice plant and the substation. Accordingly, he had seen the sign "Danger—High Voltage" on the chain-link fence enclosing the substation, and he knew that defendant's transmission line ran in a general northerly direction from the substation along the east side of the cotton patch and over the oak tree and that "a high line pole" was located "right next to the tree." When pressed on cross-examination to admit that "from anywhere off on any side of that [oak] tree you could look up and see where those high line wires went through the top branches of the tree," plaintiff's response was that "you could see they went over it, but you couldn't see that they went through it." Later, he agreed that, if he had "looked careful," he "probably" could have seen branches of the oak tree "up in those high line wires"; and, when counsel followed with the accusation, "you weren't being careful, were you," he conceded, "no, sir, because I had been up there before." Defendant's counsel also point to plaintiff's testimony on cross-examination that, prior to the accident, he had experienced "small" shocks from automobile batteries and an electric fence, and that, in an eighth-grade class, he had studied an elementary textbook on "Adventuring in Science," including a chapter therein titled "Electricity All About Us."

Defendant insists that plaintiff "is to be treated as an adult in determining his conduct and resolving the question of contributory negligence." In the one case [Frauenthal v. Laclede Gaslight Co., 67 Mo. App. 1] cited to this contention, a youth "in his seventeenth year, fully developed, over six feet tall, intelligent, of studious habits, and * * * filling a responsible position in one of the wholesale houses" [67 Mo.App. at 5], who had been warned and knew of the danger of approaching an energized electric line lying in a public street, was held contributorily negligent as a matter of law when, after wrapping a handkerchief around his hand, he deliberately reached over the shoulder of an adult attempting to cut the wire with insulated pliers, took hold of the wire, and was electrocuted. On motion for rehearing, two of the judges, emphasizing that the deceased youth "possessed unusual intelligence for a youth of his age," thought that "his conduct must be measured or judged by the standard of an average prudent man." 67 Mo.App. at 12. Passing questions as to whether the last-quoted statement of opinion was either sound or necessary to the end result (an entirely proper one, we would agree, upon the recited facts), Frauenthal is not persuasive authority for instant defendant's contention.

It may be true that, as was stated in Frauenthal, supra, 67 Mo.App. at 11(2), the presumption is that a minor fourteen years of age or older has sufficient comprehension to be capable of, and chargeable with, contributory negligence; but it by no means follows that the conduct of all minors fourteen years of age or older is to be measured by the same standard as that of adults. Annotation 107 A.L.R. 4, 141; annotation 174 A.L.R. 1080, 1147. On the contrary, it was settled long ago by our Supreme Court, en banc, in Moeller v. United Rys. Co., 242 Mo. 721, 729, 147 S.W. 1009, 1012 (6), that "[t]he court cannot specify the age to which a child, when attained, shall be held as liable in such case as a person of full maturity, because there are other facts to be taken into account—the peculiar circumstances of the particular case, the knowledge and experience of the child in

reference to those circumstances, and his capacity to appreciate the danger." And shortly thereafter, in Jackson v. Butler, 249 Mo. 342, 155 S.W. 1071, where the contributory negligence of a minor plaintiff "between 17 and 18 years of age" was for the jury, although, if his conduct had been measured by the same standard of care as that required of an adult, plaintiff would have been contributorily negligent as a matter of law [249 Mo. at 368, 155 S.W. at 1079(14)], the same tribunal emphasized that "[t]here is no fixed rule of law by which to gauge, or scale by which to nicely weigh, the acts of a minor to determine if he is guilty of contributory negligence." 249 Mo. at 369, 155 S.W. at 1079.

The course of conduct which culminated in instant plaintiff's injury, to wit, "playing hooky," aimlessly wandering about, and finally climbing the oak tree while "just messing around, passing the time away," in the company of two boys fifteen years of age, was a convincing manifestation as well as a natural product of juvenile immaturity, not of adult maturity. Certainly the hereinbefore-quoted characterization with which the court enshrouded the deceased youth in Frauenthal v. Laclede Gaslight Co., supra, 67 Mo. App. at 12 (i. e., as one "possessed [of] unusual intelligence for a youth of his age") would not fit instant plaintiff with his sorry scholastic record. So, it appears clear to us that, in resolving the issue as to plaintiff's contributory negligence, we should consider his conduct not as though it were that of an adult but rather in the light of the time-honored standard that the care and caution required of a minor, who is of sufficient age to be chargeable with contributory negligence, is that ordinarily exercised by others of the same age, experience and capacity under the same or similar circumstances.[2]

Furthermore, we bear in mind the general principle that: "'A voluntary exposure to known danger is an essential element of contributory negligence. Moreover, it is the appreciation of, or the opportunity to appreciate, the peril in an instrumentality or condition, rather than a knowledge of its physical characteristics, that bars a plaintiff of recovery for negligence.'"[3] A fortiori, in actions by minor plaintiffs: "Knowledge and appreciation of the danger and risk of injury, actual or imputed, is essential in order that a child may be guilty of contributory negligence. Mere knowledge that injury might result, without appreciation of the risk of injury to which his conduct exposed him, is not sufficient."[4]

Defendant asserts that plaintiff "knew" that the wires running through the top of the oak tree were "high voltage wires"; but, although we find references in plaintiff's cross-examination to "a high line pole" close to the oak tree and "three high line wires" over that tree, we are not satisfied that his testimony, considered as

2. Dodwell v. Missouri Pac. R. Co., Mo., 384 S.W.2d 643, 647(7); Warren v. Kansas City, Mo., 258 S.W.2d 681, 683(3); Beebe v. Kansas City, 327 Mo. 67, 34 S.W.2d 57, 58(5); Jackson v. Butler, 249 Mo. 342, 155 S.W. 1071, 1079(16); Spillane v. Missouri Pac. R. Co., 135 Mo. 414, 37 S.W. 198, 201(2); Hammontree v. Edison Bros. Stores, Mo.App., 270 S.W. 2d 117, 125(11); Lottes v. Pessina, Mo. App., 174 S.W.2d 893, 899(12); Dorlac v. Bueneman, Mo.App., 129 S.W.2d 108, 110(2); annotation 174 A.L.R. 1080, 1084, 1134–1145; annotation 107 A.L.R. 4.

3. Bartlett v. Taylor, 351 Mo. 1060, 1071, 174 S.W.2d 844, 851(10, 11); 38 Am. Jur., Negligence, § 188, p. 864. See Arkansas-Missouri Power Co. v. Carl, C.A.Mo., 280 F.2d 7, 10–11(4).

4. Turner v. City of Moberly, 224 Mo.App. 683, 685, 26 S.W.2d 997, 998; Wilson v. White, Mo.App., 272 S.W.2d 1, 6–7(12); Hosford v. Clark, Mo.App., 359 S.W.2d 424, 428(5), application to transfer denied by Mo.Sup., No. 49765; United States v. Stoppelmann, C.A.Mo., 266 F.2d 13, 19. See Cathey v. De Weese, Mo., 289 S.W.2d 51, 56–57(6–11); 65A C.J.S. Negligence § 148, p. 187.

a whole as it should be [Dimond v. Terminal R. R. Ass'n. of St. Louis, 346 Mo. 333, 141 S.W.2d 789, 799(12); Garrard v. State Dept. of Public Health & Welfare, Mo.App., 375 S.W.2d 582, 592(25); Dugan v. Rippee, Mo.App., 278 S.W.2d 812, 816 (7)], compels the conclusion that he knew those were "high voltage wires." But, if that conclusion be accepted for the purposes of this discussion, it remains indisputable that nothing in the record suggests that plaintiff had either knowledge or experience concerning the conductivity of electrical energy through the limbs or leaves of a tree. Cf. Lamb v. Consumers Power Co., 286 Mich. 228, 281 N.W. 632, 636(7). In fact, the only evidence on this subject indicates that what may result from contact between the limbs or leaves of a tree and a high-voltage transmission line depends upon various factors and might not be predicted with confidence and certainty even by an adult with electrical experience and training. For, when asked "what is going to happen if a limb gets into that [33,000 volt] line," witness Goldsmith, foreman of one of defendant's crews maintaining and constructing such lines, responded: "Well, of course, that depends on the size of the limb and the moisture content. A completely dry limb, nothing would happen. If the limb was wet or if it was raining, there would be current flow through that to the ground through the tree." Continuing, Goldsmith said that, "if a sizeable wet limb got into that line * * * it would operate a circuit breaker * * * [and] would deenergize the line." To inquiry at another point concerning "what route would the current follow if the limb were on the line," Goldsmith replied, "if it was between the two lines it would flow from one wire to the other, if it touched one wire * * * it would flow to the ground."

The uncontradicted evidence, which the triers of the facts were at liberty to accept, was that plaintiff had, without incident or injury, climbed into the oak tree "about twelve times" during the preceding spring and summer [cf. Ward v. Penn Mutual Life Ins. Co., Mo.App., 352 S.W.2d 413, 423–424(10)]; that, on the occasion under review, he and his companions had been in the tree about three minutes before any of them were shocked; that, at the moment of injury, plaintiff was doing nothing other than talking; and that his head then was about six feet from the top of the tree and almost that far from the overhead transmission lines, none of which were contacted by any of the boys. Thus, there was no voluntary exposure to known danger (see authorities cited marginally in note 3); and, in the stated circumstances, we have no doubt but that reasonable minds well might disagree [Losh v. Ozark Border Elec. Co-op., Mo., 330 S.W.2d 847, 851(4)] as to whether plaintiff fully comprehended the potential danger and appreciated the possible risk of injury inherent in his conduct (see authorities cited marginally in note 4). Accordingly, we believe and hold that the issue of contributory negligence was for the jury and that the trial court erred in setting aside the judgment on the stated ground that plaintiff was contributorily negligent as a matter of law—a conclusion in consonance with, and finding support in, numerous electrical cases in this jurisdiction, some involving minors[5] and many involving adults,[6] where, in a

5. Pulsifer v. City of Albany, 226 Mo.App. 529, 47 S.W.2d 233, 236(3–6) (boy 19); Sanders v. City of Carthage, Mo.App., 9 S.W.2d 813, 815(1), affirmed on this issue (but rev. and rem. on other grounds) 330 Mo. 844, 849, 51 S.W.2d 529, 531(2) (boy 17); Godfrey v. Kansas City Light & Power Co., 299 Mo. 472, 487, 253 S.W. 233, 237 (boy 12); Godfrey v. Kansas City Light & Power Co., 213 Mo.App. 139, 148, 247 S.W. 451, 454(3) (boy 12); Kidd v. Kansas City Light & Power Co., Mo.App., 239 S.W. 584, 586(1) (boy 11). See also Lamb v. Consumers Power Co., 286 Mich. 228, 281 N.W. 632, 636(6, 7) (boy 13).

6. Potter v. Sac-Osage Elec. Coop., Inc., Mo., 335 S.W.2d 192(1); Losh v. Ozark Border Elec. Co-op., Mo., 330 S.W.2d 847, 852(5); Erbes v. Union Elec. Co., Mo., 353 S.W.2d 659, 666(3); Lebow v.

wide variety of circumstances, the issue of contributory negligence has been for the jury.

None of the six electrical cases cited by instant defendant would require or support a contrary conclusion on the record before us. In four of those cases,[7] the injured person was an adult. In Godfrey v. Kansas City Light & Power Co., 299 Mo. 472, 253 S.W. 233, the court, in affirming (on condition of remittitur) a judgment for plaintiff, a boy twelve years of age, who had been shocked and burned by uninsulated wires running through a walnut tree in a pasture, specifically stated that "we hold that plaintiff was not guilty of such contributory negligence, as a matter of law." 299 Mo. at 487, 253 S.W. at 237. In Foote v. Scott-New Madrid-Mississippi Elec. Co-op., Mo.App., 359 S.W.2d 40, application to transfer denied by Mo.Sup., No. 49729, we reversed a judgment for plaintiff on the sole ground that defendant was not guilty of actionable negligence and, as we pointed out, did not consider or rule defendant's contention that the deceased youth had been contributorily negligent as a matter of law. 359 S.W.2d at 47.

*Did plaintiff make a submissible case of actionable negligence on the part of defendant?* Having frankly admitted in arguing the issue of contributory negligence that "a dangerous situation existed by reason of uninsulated high voltage wires being in close proximity to the uppermost branches of the tree," defendant's position on the issue of actionable negligence is formulated in this language: "There was no evidence that respondent [defendant] had knowledge that anyone had climbed this tree before. The tree was difficult to climb and the lowest limbs were six to ten feet above the ground. It was located in a remote and isolated area not readily accessible to the public. Respondent could not reasonably foresee or anticipate that appellant would be likely to climb this tree * * *." It has been stated repeatedly that "[m]ost duties, imposed by the law of torts, arise out of circumstances and are based on 'foreseeability' or reasonable anticipation that harm or injury is a likely result of

---

Missouri Public Service Co., Mo., 270 S.W.2d 713, 716–718(5) ; Laudwig v. Central Missouri Power & Light Co., 324 Mo. 676, 686, 24 S.W.2d 625, 628; Thompson v. City of Lamar, 322 Mo. 514, 17 S.W.2d 960, 968–969(4); Solomon v. Moberly Light & Power Co., 303 Mo. 622, 262 S.W. 367, 371(3); Privette v. City of West Plains, Mo.App., 93 S.W.2d 251, 254; Davis v. Missouri Elec. Power Co., Mo.App., 88 S.W.2d 217, 221(3), certiorari quashed State ex rel. Missouri Electric Power Co. v. Allen, 340 Mo. 44, 100 S.W.2d 868; Kessler v. West Missouri Power Co., 221 Mo.App. 644, 283 S.W. 705, 709(7, 9); Hesser v. City of Carthage, 216 Mo.App. 140, 256 S.W. 161, 162(1); Hollis v. Kansas City Light & Power Co., 204 Mo.App. 297, 224 S.W. 158, 164(7); Faris v. Lawrence Co. Water, Light & Cold Storage Co., Mo.App., 198 S.W. 449(1, 2); Mahaney v. City of Independence, Mo.App., 183 S.W. 1117, 1120(6); Blackburn v. Southwest Missouri R. Co., 180 Mo.App. 548, 167 S.W. 457, 460(7). See also Arkansas-Missouri Power Co. v. Carl, supra note 3, 280 F.2d at 9–10(1–4); Polk v. City of Los Angeles, 26 Cal.2d 519, 159 P.2d 931, 936–937(9–12); Philbin v. Marlborough

Elec. Co., 218 Mass. 394, 105 N.E. 893, 894(2).

7. Gladden v. Missouri Public Service Co., Mo., 277 S.W.2d 510 (plaintiff 39, employed in "testing jet engines," contacted uninsulated electric lines while climbing tree to catch tame parakeet, but nevertheless issue of contributory negligence was for jury because plaintiff said that he did not know those wires carried electricity); Hamilton v. Laclede Elec. Coop., Mo., 294 S.W.2d 11 (plaintiff wife 49 and her husband 43, who "had worked for a utility company in 'high lines' * * * and had quit such employment because of his fear of electricity," were injured when pump being removed from well came in contact with overhead transmission lines in plain view and 12' south of well); Coleman v. North Kansas City Elec. Co., Mo., 298 S.W.2d 362 (plaintiff 35, an electrician, was injured while working in an obviously dangerous position atop a transformer); Gray v. Union Elec. Light & Power Co., Mo.App., 282 S.W. 490 (deceased, an electrician with 4–5 years' experience, had contacted "hissing," "sizzling" wire which had fallen on sidewalk).

acts or omissions";[8] and, as instant defendant emphasizes, " '[a]nticipation' or 'foreseeability' is an essential element in determining negligence" in actions of this character. Gladden v. Missouri Public Service Co., Mo., 277 S.W.2d 510, 519(10); Foote v. Scott-New Madrid-Mississippi Electric Co-op., supra, 359 S.W.2d at 43, and cases there cited in note 3. That was the element wanting here, so defendant insists.

Briefly returning to the facts, we recall that the oak tree stood in the "northeast part" of the City of Kennett, near the unfenced boundary line between the east side of the nine-acre cotton patch and the west side of the north-south railroad spur track right of way, and at a point approximately 1,039 feet (less than .2 mile) north of defendant's substation and adjacent ice plant. The "headquarters" of foreman Goldsmith's maintenance-construction crew, where each day's work terminated, was in the ice plant. From Electric Street, the paved east-west city street in front of defendant's substation and ice plant, a "little side road" or "turn road" ran north past a cotton gin and then along the east side of the cotton patch, just west of the railroad right of way. The north side of the cotton patch could be seen from Electric Street, and Baker Addition with "quite a few" houses and Osborn Addition were *north* of the patch. Immediately *east* of the cotton patch and railroad right of way, there were "one or two homes * * * on the Hemphill property." The North School in the Kennett school system was immediately *west* of the cotton patch. Plaintiff's witness McFadden, who had resided on Electric Street near defendant's

ice plant for thirty years, testified that, although there was no street or alley through the cotton patch, "there's people go that way or walk up the railroad track * * * people do walk up through there"— "it isn't uncommon to see grown people or children" there.

In considering the situation at hand, we are not wandering in an uncharted area, for our appellate courts have written in a number of tree-climbing cases,[9] in each of which a judgment for plaintiff has been affirmed, sometimes conditioned on remittitur. The rationale of those cases is "that the defendant electric company is required to anticipate the presence of boys in trees through which its uninsulated wires pass, because of the natural and habitual instinct and proclivity of red-blooded, venturesome, growing boys to climb trees, and also that a boy is not a trespasser upon the property of the electric company while in the branches of a tree owned by a third party." Howard v. St. Joseph Transmission Co., 316 Mo. 317, 324, 289 S.W. 597, 600, 49 A.L.R. 1034. However, instant defendant contends, in substance, that it reasonably could not have been charged with the duty to have anticipated the presence of boys in the oak tree, because (so it asserts) it did not have *actual* knowledge that boys had climbed this tree previously, "the tree was difficult to climb and the lowest limbs were six to ten feet above the ground," and "it was located in a remote and isolated area not readily accessible to the public."

True, there was no evidence that defendant had *actual* knowledge of previous

---

**8.** Hull v. Gillioz, 344 Mo. 1227, 1236, 130 S.W.2d 623, 628(5); Emery v. Thompson, 347 Mo. 494, 498, 148 S.W.2d 479, 480(3); Phillips v. Stockman, Mo.App., 351 S.W.2d 464, 472; La Plant v. E. I. Du Pont De Nemours & Co., Mo.App., 346 S.W.2d 231, 239; Taylor v. Hitt, Mo.App., 342 S.W.2d 489, 494(7); Street v. W. E. Callahan Const. Co., Mo.App., 147 S.W.2d 153, 155(3). See 2 Harper & James, Torts, § 16.9, loc. cit. 929; 2 Restatement of Torts, § 289, comment b, p. 763.

**9.** Shannon v. Kansas City Light & Power Co., 315 Mo. 1136, 287 S.W. 1031; Godfrey v. Kansas City Light & Power Co., 299 Mo. 472, 253 S.W. 233; Williams v. Springfield Gas & Electric Co., 274 Mo. 1, 202 S.W. 1; Beckwith v. City of Malden, 212 Mo.App. 488, 253 S.W. 17; Godfrey v. Kansas City Light & Power Co., 213 Mo.App. 139, 247 S.W. 451; Thompson v. City of Slater, 197 Mo.App. 247, 193 S.W. 971.

climbing in this tree; but, the meritorious inquiry is not what defendant actually knew but rather what it reasonably should have anticipated. The oak tree may have been *relatively* more difficult to climb than many trees but, as we have noted, it offered no substantial obstacle to teen-age youths desirous of indulging their natural propensity to climb trees, for the undisputed evidence was that plaintiff had climbed into this tree "about twelve times" during the spring and summer preceding his accident, accompanied on five or six of those occasions by his brother and sometimes by three other youths. The lowest limbs of the oak tree apparently were no farther from the ground than the lowest limbs of the tree described in Thompson v. City of Slater, 197 Mo.App. 247, 193 S.W. 971, where plaintiff's brother had boosted him into the tree [197 Mo.App. at 255, 193 S.W. at 973] and, after plaintiff's injury, his father "was able, by 'jumping up' or making 'a little hop,' to grasp one of the lower limbs and thus climb into the tree." 197 Mo.App. at 254, 193 S.W. at 972. And see the photograph and description of the tree in Williams v. Springfield Gas & Electric Co., Mo.App., 187 S.W. 556, 558–559 [on transfer, judgment for plaintiff minor affirmed at 274 Mo. 1, 202 S.W. 1], where plaintiff went from the roof of a house into the tree to the wonderment of our predecessors thus expressed: "Looking at the photograph one cannot see how plaintiff got from the roof to the tree unless he pulled the tree toward him by a small limb, and then jumped or swung over to it." 187 S.W. at 559. Consult also Beckwith v. City of Malden, 212 Mo.App. 488, 493, 253 S.W. 17, 19, where plaintiff climbed from a board fence into a tree, the lowest limb of which was nine feet from the ground. "Everybody knows boys will climb trees. It is the probability of their presence there which brings trees within the general rule of Geismann v. Missouri-Edison Elec. Co., supra [173 Mo. 654, 73 S.W. 654]. The rule is not that only such boys are protected as may *climb from the ground* into a tree. The thing required to be anticipated is the *presence* of children *in the tree.*

The method by which they get into it cannot ordinarily be very important." Williams v. Springfield Gas & Elec. Co., 274 Mo. 1, 11, 202 S.W. 1, 2–3; Shannon v. Kansas City Light & Power Co., 315 Mo. 1136, 1149, 287 S.W. 1031, 1035; Beckwith v. City of Malden, supra, 212 Mo.App. at 497, 253 S. W. at 20.

As for the location of the oak tree, it was, as we have said, within the corporate limits of Kennett, near the unfenced west line of the railroad right of way, less than .2 mile from defendant's substation, ice plant, and maintenance-construction crew headquarters, and in easy sight of that substation, of a school to the west, and (as shown by photographic exhibits) of dwellings to the east and south. In these circumstances, we think that defendant overstates its case in describing the tree as "located in a remote and isolated area not readily accessible to the public." Granting that it was in a *relatively* more remote location than the trees described in *some* of our Missouri tree-climbing cases, the oak tree certainly was no more "remote and isolated" and no less "accessible to the public" than the walnut tree described in Godfrey v. Kansas City Light & Power Co., 299 Mo. 472, 253 S.W. 233, which was in a 100-acre pasture wholly "inclosed with wire fence" and outside the corporate limits of any municipality and which was "about a quarter of a mile north of Pacific Street," an east-west street just outside the south boundary fence of the pasture, and even farther from plaintiff's home one and one-half blocks south of Pacific Street. 299 Mo. at 478–479, 253 S.W. at 234.

██ Although an electric utility is not an insurer of the safety of persons and property, it is obligated to employ care commensurate with the mysterious nature and lethal potentiality of the invisible force known as electricity, to wit, the highest degree of care either to insulate its transmission lines adequately or to isolate them effectively wherever, in the exercise of such degree of care, it reasonably may be

anticipated that others, whether for business or pleasure, lawfully may come into close proximity to such lines and thereby may be subjected to a reasonable likelihood of injury. Foote v. Scott-New Madrid-Mississippi Elec. Co-op., supra, 359 S.W.2d at 43(2, 3), and cases there cited in notes 1 and 4. A submissible case on the issue of anticipation or foreseeability was made if the jury fairly could have found that, in the exercise of the highest degree of care, defendant reasonably could have anticipated that some injury was likely to have occurred to one lawfully near its transmission line, and it was not necessary for the jury to have been able to find that defendant could have anticipated the particular injury which was sustained or the precise manner in which that injury was suffered. Erbes v. Union Electric Co., supra, 353 S.W.2d at 664; Lebow v. Missouri Public Service Co., Mo., 270 S.W.2d 713, 715; Thornton v. Union Electric Light & Power Co., 230 Mo.App. 637, 72 S.W.2d 161, 163(1–3). The Missouri tree-climbing cases cited marginally in note 9, as well as the score of electrical cases cited marginally in notes 5 and 6, dramatically demonstrate that the outer limits, within which the triers of the facts are permitted to find anticipation or foreseeability in litigation of this character, are exceedingly broad and flexible. Due respect for governing principles and their application in cited tree-climbing and electrical cases leaves us unable to escape the conclusion that, on the record before us, the issue as to anticipation or foreseeability was for the triers of the facts and may not be declared by us, as a matter of law, and that, therefore, plaintiff made a submissible case of actionable negligence on the part of defendant.

Accordingly, it is the judgment of this court (a) that the order and judgment of the Circuit Court of Dunklin County in this cause on March 14, 1966, sustaining defendant's after-trial motion and entering judgment for defendant be set aside and for naught held, and (b) that the cause be remanded to said circuit court with directions to reinstate and re-enter as of December 21, 1965, the judgment for plaintiff in the sum of $15,000 originally entered on that date upon the jury verdict then returned.

HOGAN and TITUS, JJ., concur.